366 So.2d 172 (1979)
KILLEARN PROPERTIES, INC., a Florida Corporation and Killearn Homes Association, Inc., a Florida Corporation, Not for Profit, Appellant,
v.
CITY OF TALLAHASSEE, a Municipal Corporation, Organized and Existing under the Laws of the State of Florida, Appellee.
No. DD-38.
District Court of Appeal of Florida, First District.
January 17, 1979.
Rehearing Denied February 1, 1979.
*173 Edward S. Jaffry and Mallory E. Horne of Horne, Rhodes, Jaffry, Stephens, Bryan, Horne & Chapman, Frank A. Graham, Jr., Tallahassee, for appellant.
James R. English and Bryan W. Henry, Tallahassee, for appellee.
*174 BOYER, Acting Chief Judge.
The facts of the case are for the most part undisputed. The basic conflict involves an agreement between the City of Tallahassee (hereinafter referred to as City) and Killearn Properties, Inc. (formerly, Killearn Estates) (hereinafter Killearn) whereby the City was to supply street lights and the necessary electrical power therefor to the Killearn subdivision in Leon County, near Tallahassee.
On December 31, 1964, a letter (Plaintiff's Exhibit "A") was sent by Mr. J.T. Williams, President of Killearn Estates, Inc., (the predecessor corporation to appellants, Killearn Properties, Inc.) to the then City Manager, Mr. Arvah Hopkins, regarding the possible installation of street lights and electrical power in the Killearn subdivision. That letter was signed by both Mr. Bill G. Cartee, then the President of Killearn and Mr. Hopkins as City Manager, and included the following paragraph:
"Street lighting will be available in the area and the financial arrangements regarding the number to be furnished by the City will be negotiated in the near future."
Killearn was simultaneously considering obtaining the same services from a competitor of the City, Talquin Electric Corp. The record clearly reveals that both the City and Talquin were competing for the business and that both were willing to negotiate for the privilege of furnishing electricity to the subdivision. In reliance upon the representations and promises of the City, it was chosen to provide the services and in 1965 it installed street lights for which appellant, Killearn Homes Association, Inc., paid until 1968.[1]
Mr. Hopkins, the City Manager, did not have the authority to sign a formal contract for the City, but had the duty to "work these arrangements out and present them to the City Commission."
In mid 1967 or early 1968, Mr. Hopkins arranged for billing of the street lights to cease. Mr. Williams testified that there was no written evidence of that arrangement. His testimony did indicate that he and Mr. Hopkins had planned to adopt a "formula" for street light service.
On November 2, 1967, the City and Killearn reduced to writing the arrangements of December 31, 1964. (Plaintiff's Exhibit "B") That agreement recited that the parties "hereto mutually affirm and ratify each and every of the numbered conditions and agreements entered into on December 31, 1964 ...". That document bore the signatures of the then Mayor, the Honorable John A. Rudd, Sr., and the then Killearn President, Bill G. Cartee.[2]
In March 1970, a memorandum was signed by the City Commissioners (Plaintiff's Exhibit "C"). They did not sign at an open regular meeting, but rather signed sporadically over a period of two days. However, the record reveals that the memorandum was discussed in open sessions of the Commission and for all practical purposes there approved.
The memorandum provided as follows:
"According to Killearn's agreement with the City dated December 31, 1964, paragraph 5, financial arrangements regarding the number of lights to be furnished by the City `will be negotiated in the near future'. The negotiations were delayed until about June of 1967, at which time an agreement was reached regarding a policy which could be appropriate to any area served by the City of Tallahassee, as follows: Street lights shall be furnished by the City of Tallahassee under the following conditions:
"1. The area covered must be using City electrical and water services.
"2. The area must include at least 100 homes.
"3. An association must be formed by the residents through which a street light contract would be paid.

*175 "4. The street light contract must be entered into at the time electrical services are installed.
"5. During the first 3 years of street light service, one street light shall be furnished free of charge for each $1,000.00 of utility revenue received each year by the City.
"6. After the first 3 years of service, one street light shall be furnished free of charge by the City for each $750.00 of utility revenue received each year by the City.
"In view of the above, the City should immediately compute the amount of money which should either be refunded to the Killearn Home Association or the additional amount which that association owes to the City for all street lights within Killearn's property. In addition, street lights should be installed immediately in Unit 7 which has been under contract since November of 1968."
On May 8, 1974, Mr. Williams received a letter from Mr. Cook, the City Auditor and Clerk, (Plaintiff's Exhibit "D") which stated:
"At the direction of the City Commission and City Attorney Bryan Henry, I am forwarding a bill for street lights in Killearn. The bill covers the period from November 20, 1970, through April 20, 1974.
"Further at the direction of the Commission, the bill is to be processed in the routine which applies to the collection of all utility accounts. For your information, that routine is as follows:
"1. The bill is due upon receipt.
"2. The bill becomes delinquent fifteen days after receipt and a second notice is forwarded.
"3. If the bill has not been paid ten days after it becomes delinquent, an order to discontinue service is dispatched to the Electric Department.
"If you have any questions regarding this matter or the procedure, please call me."
On September 8, 1976, Killearn and Killearn Homes Association filed a Complaint in the Circuit Court in Leon County asserting that the City was and is obligated to furnish street light service to Killearn Estates pursuant to the above mentioned agreements.
The Complaint alleged that the City had indicated that it would discontinue the street light service until the Plaintiffs complied with the City's request that they pay an alleged back bill for such service.
The City answered the Complaint and counter-claimed for an amount of $25,308.96 for furnishing, at Killearn's request, 118 street lights and the electricity to illuminate them. The counter-claim asserted that a demand for payment had been made and refused. The City also affirmatively defended on the ground that portions of the alleged contracts violated the 1957 Code of the City of Tallahassee and were therefore beyond the capacity of the City of Tallahassee to perform.
Killearn answered the counter-claim, and affirmatively defended that Killearn was under no duty to pay for the street lights, that the City was guilty of laches, and that the City was estopped from claiming any payment for the street lights.
A pretrial order was filed in which certain facts were stipulated and the legal issues were delineated.
On July 13, 1976, following a trial on the merits, the Judge entered the final judgment here appealed. It provides:
"This cause came on for trial without a jury on a Complaint for Declaratory Judgment, and pleadings responsive thereto, a Counterclaim filed by the Defendant, and pleadings responsive thereto, and the Court having heard the testimony, argument of counsel and being otherwise fully advised in the premises, finds as follows:
"(1) That in 1964 the Defendant, City of Tallahassee, had a surplus of electricity and by and through its then City Manager, Arvah B. Hopkins, by and with the consent of the then City Commission, did negotiate and agree with Killearn Estates, Inc., predecessor corporation to Plaintiffs, Killearn Properties, Inc., to *176 furnish utility services to a subdivision of Plaintiffs; which agreement was introduced into evidence as Plaintiff's Exhibit `A'. The evidence further revealed that at the same time, Plaintiffs' were negotiating with a competitor of Defendant, to-wit: Talquin Electric Coop, for it to provide the same services which were ultimately provided by Defendant. That both Defendant and Talquin were willing to make concessions to Plaintiffs in order to get their business, and agreement was finally made with Defendant, inasmuch as, the officers of Plaintiff's Corporations, being life residents of Tallahassee, felt they owed it to the City to give them the business in order to help it dispose of the surplus of electricity then existing.
"(2) Subsequently, the agreement reached between Plaintiffs and Defendant was reduced to writing, formally adopted and ratified by the City of Tallahassee. Said writing, or Contract, was introduced in evidence as Plaintiffs' Exhibit `B'.
"(3) Paragraph number `5' of the Contract between the parties, provided as follows:
`5. Street lighting will be available in the area and the financial arrangements regarding the number to be furnished by the City will be negotiated in the near future.'
"(4) In March of 1970, no implementation of the above paragraph `5' of the Contract having been had, the individual City Commissioners then in office, signed a memorandum, introduced in evidence as Plaintiffs' Exhibit `C', in which a formula was set forth enumerating, among other things, that Defendant, City of Tallahassee, would furnish one (1) free street light for each $1,000.00 of utility revenue received annually by the Defendant. This document was signed by the various Commissioners at various places over a two (2) day period.
"(5) The parties relied upon said memorandum and performed thereunder. The Defendant ceased billing Plaintiffs for street lights in October, 1970, and transferred sufficient funds from its General Revenue to its Electric Reserve to satisfy the past-due bill. Thereafter, annually, the Defendant made similar transfers, which transfers were budgeted and said budgets approved in open meeting of the City Commission.
"(6) The evidence was conflicting as to whether or not the memorandum was ever approved by the City Commission in open meeting. The recollections of the then City Manager, Arvah Hopkins, and of Commissioner Taft, were that it was approved in open meeting. Commissioners Everhart, Berkowitz and Camp testified that it was not their intention, and they did not sign the Memorandum with the intent that it be a binding contract. Each of them subsequently approved the budget transfers of revenue, however, former City Auditor-Clerk, Louis Cook, testified that he saw the instrument in question the day it was finally executed, but that it was never approved in an open meeting.
"(7) That sufficient revenues have been received to provide for the street lights in existence under the formula set forth in Exhibit `C', and that such lights are not free, but are provided in return for the substantial utility income received by Defendant from Plaintiffs' subdivision.
"(8) That while the document marked Exhibit `C' does not meet formal requirements of a contract, the parties have abided by it and should be estopped to deny the agreement as it is hereby found to reasonable and substantial benefits therefrom have flowed to each party; that the agreement originally entered into by the parties contemplated that some agreement would be reached by the parties relative to street lights.
"(9) That the memorandum marked Exhibit `C' is not necessarily binding for all time, and if Defendant can show that the change sought by it is reasonable, then it has the right to re-negotiate the terms thereof. See Southern Gulf Utilities, Inc. v. City of North Miami Beach, (1975 3rd DCA) 323 So.2d 669.

*177 "Accordingly, it is,
"ORDERED AND ADJUDGED:
"1. That the Court finds for the Plaintiffs and against the Defendant, City of Tallahassee; that the document admitted into evidence as Exhibit `C', while not binding on the City of Tallahassee for all time, has been complied with by the parties as being a binding contract and was entered into as implementing the agreement made by the parties in November 1967, Exhibit `B', which set out the matters contained in Exhibit `A'. That the document marked Exhibit `C' was fair and reasonable at the time it was entered into, and the Defendant, City, should be and is hereby estopped to deny the same.
"2. That Defendant, City of Tallahassee, return to the Plaintiffs, the sums of money paid to it for street lights for the period November 20, 1970, to April 20, 1974. That the City is bound by the memorandum Exhibit `C' until May 8, 1974, the time it notified Plaintiffs that Defendant expected to be paid for street lights, thereby putting Plaintiffs on notice that they did not elect to be bound by Exhibit `C'; that upon proper showing that the charges proposed by the City are reasonable, as contemplated by the Southern Gulf Utilities case, cited above, then the City shall be entitled to charge Plaintiffs for such street lights from May 8, 1974, as the rate determined to be reasonable."
Killearn timely filed its Notice of Appeal in which Killearn Homes Association joined. The City filed a notice of cross-appeal.
Killearn takes the position that the City is bound by its agreements evidenced by the written document signed by the various City Commissioners in 1970 (Plaintiff's Exhibit "C") concerning the installation and services of street lights, arguing that the City was engaged in a proprietary as opposed to governmental function, that the City is therefore subject to the same legal principles that govern individuals engaged in business transactions, that the doctrine of equitable estoppel therefore precludes the City from denying the applicability of their agreements both prior and subsequent to May 8, 1974, (the date the City notified Appellants that it expected to be paid for the street lights) and that the Trial Court erred in concluding that the City had no obligation subsequent to May 8, 1974.
The City recognizes and admits that the installation of street lights is an exercise of a proprietary function and that in certain circumstances the doctrine of equitable estoppel may be applied in Florida against municipalities in the exercise of their proprietary functions. (See, for instance, Hollywood Beach Hotel Co. v. City of Hollywood, 329 So.2d 10 (Fla. 1976), Sakolsky v. City of Coral Gables, 151 So.2d 433 (Fla. 1963), City of North Miami Beach v. Keller, 308 So.2d 558 (Fla. DCA 1975).) However, the City argues that Southern Gulf Utilities, Inc. v. City of North Miami Beach, 323 So.2d 669 (Fla. 3rd DCA 1975),[3] cited by the trial judge, precludes application of the doctrine of estoppel because, the City contends, a City has a right and duty, notwithstanding a contract to the contrary, to readjust its rates provided the readjustment is reasonable. The City then continues its argument to the effect that the provisions of any applicable existing statutes become a part of a contract upon execution and it thereupon cites several statutes or provisions of its charter which at least inferentially allow or require rate adjustments.
But the City's argument misses the point. Even Killearn agrees that applicable existing statutes are a part of the contract and that the City has a right to adjust its utility rates.[4] The issue here involved is not whether utility rates may be adjusted (increased). The agreement between the parties does not even address such a term. *178 The trial judge found, correctly the record reflects, that the street lights here involved are not free, but are provided in return for substantial utility income received by the City from the residents of Killearn.[5] Whether that income may be adjusted by adjustment of utility rates has never been an issue. The issue is whether the City may now, although it continues to receive the benefits of its agreement, viz.; it continues to receive the substantial income from electricity distributed in the Killearn subdivision, nevertheless discontinue furnishing the street lights which it clearly agreed to furnish, or alternatively extract from Killearn payment of additional revenues contrary to its agreement.
To state the issue is to answer it. Clearly the City may not do so. The agreements are clear. Indeed, the City does not deny their existence. The agreements resulted from negotiations between the City and Killearn when Killearn had other viable alternatives available to it. Talquin Electric, the record reveals, was ready, willing and anxious for Killearn's business. Killearn relied upon its agreements with the City in terminating negotiations with Talquin. Both parties acted on the agreements for several years. Killearn has complied and, from ought that appears from the record still complies, with its agreements. The City yet enjoys the fruits of its agreements in that it yet furnishes electricity to the Killearn subdivision and charges therefor. To use an old cliche, the City wants to have its cake and eat it too. That it may not do.
Further, the record reveals that Chapter 24914, § 3, Laws of Florida (1947), now found as § 225 of the City of Tallahassee Charter, authorizes the acts of the City from whence it now seeks to escape. That section provides:
"That the city is further authorized to make all contracts and execute all instruments which in the discretion of the city commission may be necessary, proper or advisable in and for the enlargement and extension of the electric plant and distribution system herein authorized, and is authorized to carry out and perform the covenants, terms and conditions of all such contracts or instruments."
First, as the Act requires, the agreements were authorized by the City Commission, and the lower court expressly held (and we agree) that estoppel carries Killearn over any objections by the City on grounds of lack of proper formalities or procedures in making the agreements. Second, the agreements made were expressly found by the lower court to be motivated on the part of the city by a desire to enlarge and extend its electric distribution system into appellants' locality. The record sustains the finding. The act also vests discretion in the City Commission. Discretion necessarily denotes reasonable latitude.
The Legislature has authorized the City to go into the marketplace and compete with whoever is there for the available electric utility business. The Legislature has also recognized that if the City is to compete and succeed it must do some bargaining, and be prepared to give quid pro quo. In Section 225, the Legislature has authorized that bargaining, and such bargaining is just what was done by the City in the case sub judice.
Whether or not the agreements between the parties, clearly revealed by the unquestioned exhibits above mentioned, are sufficient to constitute a formal contract is not, under the circumstances of this case, material. Certainly, the City admittedly acting in a proprietary capacity, estoppel is applicable. The learned trial judge so found. In that finding he was correct.
However, the trial judge erroneously held that somehow estoppel ceased when the City notified Killearn that the City did not elect to be bound by its agreement, April 20, 1974. In so holding the learned trial judge apparently relied upon Southern Gulf Utilities, Inc. v. City of North Miami *179 Beach, supra. We find, though, that that case, while expounding good law, is not here applicable. As already above observed, no rate adjustment is involved sub judice.[6]
Though application of the doctrine of estoppel against a government is no stranger to the jurisprudence of Florida (See Hollywood Beach Hotel Co. v. City of Hollywood, supra; Sakolsky v. City of Coral Gables, supra; City of North Miami Beach v. Keller, supra, and George W. Davis and Sons, Inc. v. Askew, 343 So.2d 1329 (Fla. 1st DCA 1977)), we find interesting a thorough treatment of the subject by the Supreme Court of California in City of Long Beach v. Mansell, 3 Cal.3d 462, 91 Cal. Rptr. 23, 476 P.2d 423. Examining the conflicts in the area, that court said:
"It is settled that `[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. (United States Fid. & Guar. Co. v. State Bd. of Equal. (1956) 47 Cal.2d 384, 388-389, 303 P.2d 1034 and cases there collected.)' (Driscoll v. City of Los Angeles, supra, 67 Cal.2d 297, 306, 61 Cal. Rptr. 661, 666, 431 P.2d 245, 250.) (See generally 28 Am.Jur.2d, Estoppel and Waiver, §§ 122-133, pp. 782-802; 31 C.J.S. Estoppel §§ 138-147, pp. 675-733.) Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify `a strong rule of policy, adopted for the benefit of the public, * * *' (County of San Diego v. Cal. Water and Tel. Co. (1947) 30 Cal.2d 817, 829-830, 186 P.2d 124, 132; see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." (91 Cal. Rptr. at page 45, 476 P.2d at page 445)
After a thorough examination of numerous cases dealing with the seemingly conflicting doctrines, the court undertook to resolve that conflict and in doing so stated:
"... After a thorough review of the many California decisions in this area, as well as a consideration of various out-of-state decisions, we have concluded that the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (91 Cal. Rptr. at page 48, 476 P.2d at page 448)
If the rule were not as so announced a governmental agency could purposefully fail to comply with some statutory prerequisite to the execution of a contract, avail itself of the benefits of that contract until such time as it arbitrarily and capriciously chose to ignore it, and then do so with no fear that any court could compel it to honor its agreement. It is just such a theory that the City asserts in this case and it is because of such conduct on the part of unscrupulous parties that the doctrine of equitable estoppel has become engrained as a cornerstone of the jurisprudence of a majority of the states of this nation.
Sub judice, the City induced Killearn to enter into the subject agreements and promised as part of that inducement to install street lights in the Killearn subdivision in return for utility revenue. Killearn relied on the City's representations and inducements. Repeatedly the City manifested its understanding of the terms of its agreements by installing street lights, not charging for same, collecting utility revenue and providing for the payment of such street lights from its general operating fund into its special electrical utility fund in compliance with its own requirements relating *180 to bond financing. To now permit the City to unilaterally and arbitrarily rescind its agreements and withdraw therefrom would be to sanction an injustice for which no excuse has been demonstrated.
Nor may the City bolster its position by reliance on Chapter 286, Florida Statutes, commonly referred to as the Sunshine Law. In that regard the City concludes that since the memorandum of March 12, 1970 was not signed in an open meeting with all Commissioners being present at the same time it was violative of the Sunshine Law and therefore void ab initio. We are acquainted with no authority for such a proposition.
City Commissions are unquestionably public bodies within the scope of the Sunshine Law. (Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974), cert. denied, 423 U.S. 868 (1975), City of Miami Beach v. Berns, 245 So.2d 38 (Fla. 1971), Grapeland Heights Civic Ass'n v. City of Miami, 267 So.2d 321 (Fla. 1972), Bigelow v. Howze, 291 So.2d 645 (2d DCA 1974).) However each and every discussion among City Commissioners need not be made in the sunshine. Nor is it necessary that written documents, including contracts, be signed simultaneously by the signatories nor during an open meeting.
Section 286.011, Florida Statutes (1975), provides as follows:
"286.011 Public Meetings and records; public inspection; penalties
(1) All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or any political subdivision, except as otherwise provided in the Constitution, at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, regulation, or formal action shall be considered binding except as taken or made at such meeting.
(2) The minutes of a meeting of any such board or commission of any such state agency or authority shall be promptly recorded and such records shall be open to public inspection. The circuit courts of this state shall have jurisdiction to issue injunctions to enforce the purposes of this section upon application by any citizen of this state.
(3) Any person who is a member of a board or commission or of any state agency or authority of any county, municipal corporation or any political subdivision who violates the provisions of this section by attending a meeting not held in accordance with the provisions hereof is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."
The portion of that statutory authority material here is:
"... [a]nd no resolution, rule, regulation, or formal action shall be considered binding except as taken or made at such meeting."
The record reveals that all "formal action" of the City Commission as concerns the subject at hand was taken at a public meeting "open to the public".
The letter dated December 31, 1964, (Plaintiff's Exhibit "A") to then City Commission Arvah Hopkins from Killearn's representative recites in pertinent part:
"5. Street lighting will be available in the area and the financial arrangements regarding the number to be furnished by the City will be negotiated in the near future."
Subsequent to 1964, in 1967 or 1968, as recited above, in response to the contents of Plaintiff's Exhibit "A", as well as the contents of Plaintiff's Exhibit "B" (both hereinabove mentioned) the Appellee City Commission in open meetings adopted, approved and implemented the provisions of Paragraph 5 of the "Hopkins letter" above quoted and its own formal contract containing the same provisions as that letter.
Plaintiff's Exhibit "B" was signed by the then Mayor of the City, attested to by the then City Clerk, approved by the City's then City Attorney and signed by Killearn's representative. In addition, that agreement made specific reference to the agreement of the parties on December 31, 1964, relative *181 to the furnishing of utility service. It is clear that the agreement between the parties was arrived at as the result of formal action at an open meeting of the City Commission.
In fact, an examination of the record reflects that it was in open meeting during the year 1970 that the City Commission actually authorized the payment of street light service from the City's general fund for the years 1968-1970 to its "electricity fund".
Moreover, the record reflects that on September 26, 1972, the City, recognizing that it had previously agreed to the furnishing of street light service and other utility services to Killearn, modified its earlier contracts and extended those agreements to other subdivisions owned by appellant.
Unhappily, this case is but another example of the utter disregard with which a government views its sacred obligations to its people. (Bates v. Slaughter, 347 So.2d 764 (Fla. 1st DCA 1977); State ex rel. Seal v. Shepard, 299 So.2d 644 (Fla. 1st DCA 1974); and Kurlin v. State, 302 So.2d 147 (Fla. 1st DCA 1974).) Basic morality, integrity and honesty appear to no longer have any meaning to governments and their agencies. The subject agreements, first verbal, and later reduced to writing and signed by all of the appropriate and necessary city officials, were honored by the City so long as it was in its interest to do so. It then sought to disavow same alleging that it had itself violated the Sunshine Law and thereby vitiated the agreement. There is no complaint from the City's competitor in the furnishing of electricity nor from any interested citizen. The City itself, of its own volition, seeks to take refuge in its own alleged violation of law, all the while blatantly ignoring, and seeking to escape from, its moral obligations to the citizens who reside in Killearn subdivision for whose benefits the agreements were made. A more flagrant act of dishonor can hardly be imagined. A citizen, when dealing with a government, is powerless to require that it and its officials abide by the law. Indeed, it is virtually impossible for a citizen to determine how, when or where a contract is signed or under what circumstances. In this case, as already observed, the record clearly reveals that the City's obligations were repeatedly discussed in open meetings and the manner in which the agreements were executed was never questioned nor held up to doubt. It is one thing for an aggrieved citizen to seek to have set aside an agreement between a government and another party because of Sunshine Law violations; but quite another for the governmental entity itself to seek to escape its obligations based upon its own alleged wrongdoing. It has long been recognized to be unethical for a lawyer to attack his own work product. It is at least immoral and an indication of lack of integrity for a government or its agency, whose duty it is to serve not subvert its citizens, to do the same.
The learned trial judge correctly refused to find a violation of the Sunshine Law. Even if there was a violation, under the circumstances of this case the City would be estopped to itself assert it.
Finally, Killearn Homes Association, Inc. questions the use of the plural (which necessarily includes it) by which the trial court held in the second paragraph of the adjudicatory portion of the Final Judgment "that upon proper showing * * * the City shall be entitled to charge Plaintiffs for such street lights from May 8, 1974 * *".
Briefly stated, the Homes Association's point is that the question of whether the Homes Association might be liable for the cost of operating the street lights was not at issue in this case. The complaint did not put the Homes Association's liability in issue; the answer did not put it in issue; nor did the pretrial order list it among the issues for trial. Homes Association did not submit any evidence on the question at the trial, nor did it address the issue in arguing before the court at the close of evidence, because it justifiably was under the impression that the question was not at issue.
Although Homes Association argued the point in its brief, the City did not mention it in its responsive brief.
*182 Killearn Homes has cited numerous authorities to support the proposition that such errors are the proper subject of appeal. We agree. The point is so well settled as to render citations superfluous.
Our examination of the record convinces us that the use of the plural, thereby including Killearn Homes, was probably a clerical error. In any event it was error. Accordingly, insofar as the final judgment here appealed may be subject to the construction of placing liability on Killearn Homes for payment for street lighting in the Killearn subdivision, it is reversed.
Our holdings regarding the points herein specifically discussed render consideration of the other points argued in the several briefs unnecessary.
In summary, by this opinion we:
A. Affirm the failure of the trial judge to find a violation of the Sunshine Law.
B. Affirm the application of the doctrine of estoppel to the City to deny the agreements with Killearn Properties, Inc. relative to street lighting.
C. Reverse the finding and adjudication by the trial court that the agreements are "not necessarily binding for all time and [that] if [the City] can show that the change sought by it is reasonable, then it has the right to renegotiate the terms thereof", relying on Southern Gulf Utilities, Inc. v. City of North Miami Beach, 323 So.2d 669 (Fla. 3rd DCA 1975).
D. Affirm the requirement that the City "return to the plaintiffs the sum of money paid to it for street lights for the period November 20, 1970 to April 20, 1974."
E. Affirm the adjudication by the trial court that the City is bound by its agreements with Killearn Properties, Inc.
F. Reverse the holding by the trial court that the "City shall be entitled to charge [appellants] for such street lights from May 8, 1974, as the rate determined to be reasonable."
G. Reverse the implicit holding and adjudication that Killearn Homes Association, Inc. may be charged for street lighting in the Killearn Subdivision.
Pursuant to Rule 9.330(a), Florida Rules of Appellate Procedure, the time for filing any motion for rehearing or for clarification of this decision, if any, by any party, shall be filed within eight days from date hereof.
AFFIRMED in part and REVERSED in part and REMANDED for further proceedings not inconsistent herewith.
BOYER, Acting C.J., and MASON, ERNEST E., Associate Judge, concur.
SMITH, J., concurs and dissents in part.
SMITH, J., concurring in part and dissenting in part.
I agree to the relief granted Killearn Homes Association, Inc. Otherwise I dissent, and would affirm the trial court.
I think the estoppel argument is vastly overblown by the majority opinion. When an agreement was finally struck by the parties concerning the cost of street lights, in March 1970, the Talquin Electric alternative had long since been abandoned by Killearn Properties, Inc. The 1964 agreement simply provided that "Street lighting will be available in the area and the financial arrangements regarding the number to be furnished by the City will be negotiated in the near future."
Even if the 1970 contract had been one between private parties, and the City had been capable and desirous of contracting in a favorably discriminatory way toward KPI, at the expense of its other customers and taxpayers, the 1970 contract was for an indefinite period but not perpetual. It would therefore have been terminable within a reasonable time, upon proper notice given. Florida-Georgia Chemical Co., Inc. v. National Laboratories, Inc., 153 So.2d 752 (Fla. 1st DCA 1963); Sound City, Inc. v. Kessler, 316 So.2d 315 (Fla. 1st DCA 1975). By enforcing the agreement to the date of termination by the City, April 20, 1974, and requiring the return of payments extracted from 1970 to 1974, the trial court gave KPI the benefit of the agreement during the period of its existence. KPI is entitled to no more.
*183 After the trial court entered its judgment in this case, relying on Southern Gulf Utilities, Inc. v. City of North Miami Beach, 323 So.2d 669 (Fla. 3d DCA 1975), the Supreme Court held that that decision was correct in recognizing the city's power to change its rates or charges notwithstanding a prior contract, but that the District Court of Appeal erred in holding that the city could not "change the contractual rate by ordinance without a showing that the new rate was reasonable." City of North Miami Beach v. Southern Gulf Utilities, Inc., 339 So.2d 173 (Fla. 1976). The Court held that the burden of pleading and proving the unreasonableness of new rates and charges was on the party contesting them. Thus both in that case and in this one there was no pleaded issue of whether the new rates and charges were reasonable. In North Miami Beach, the Supreme Court fixed responsibility for that omission on the private contractor, and sustained the city's power to charge presumptively reasonable rates notwithstanding a prior agreement. In this case, by contrast, the majority have apparently held that, as a result of the City not demonstrating the reasonableness of its new charges for electric lights, it must forever provide them to KPI's development at the contract rate. The effect, presumably, is to assess the City's other electrical customers for the cost of the preferential treatment of KPI customers.
I think this case is squarely controlled by the Supreme Court's decision in North Miami Beach. See also City of Tampa v. Tampa Water Works Co., 45 Fla. 600, 34 So. 631 (1903). The trial court's judgment is technically incorrect in its declaration that "if [the City] can show that the change sought by it is reasonable, then it has the right to renegotiate the terms thereof." But that may be excised as surplusage, and the judgment should be affirmed.
NOTES
[1] The record discloses that at that time Killearn Homes Association, Inc. was totally controlled by Killearn.
[2] The agreement was also attested by the City Auditor and Clerk and was approved by the Assistant City Attorney; both of whom also signed it.
[3] Affirmed in part and quashed in part upon certiorari being granted by the Supreme Court. See City of North Miami Beach v. So. Gulf Utilities, Inc., 339 So.2d 173 (Fla. 1976). See also Southern Gulf Utilities, Inc. v. City of North Miami Beach, 340 So.2d 983 (Fla. 3rd DCA 1977).
[4] Ibid.
[5] In that regard the street lights are not different from the utility poles, wires, transformers, etc., which the City impliedly agreed to furnish, without extra charge, in contemplation of distributing and selling energy to the residents of the subdivision.
[6] Nor is burden of proof as to reasonableness a primary issue here. (See City of North Miami Beach v. Southern Gulf Utilities, Inc., supra.) The learned trial judge did, however, obliquely address that point, incorrectly placing the initial burden on the City.