[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-13451
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 8, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-81474-CV-KLR

BOARD OF TRUSTEES OF THE CITY
OF DELRAY BEACH POLICE AND
FIREFIGHTERS' RETIREMENT SYSTEM,

                                                    Plaintiff-Appellee,

versus

CITIGROUP GLOBAL MARKETS INC.,
f.k.a. Salomon Smith Barney,

                                                    Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 8, 2010)

Before DUBINA, Chief Judge, PRYOR and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

This appeal from the denial of a motion to compel arbitration presents the

question whether the Board of Trustees of the City of Delray Beach Police and Firefighters' Retirement System agreed to arbitrate a dispute arising under its consulting contract with Citigroup Global Markets, which helped the Board evaluate the performance of several investment managers of pension funds the Board oversees. The Board complained that Citigroup abused its position as pension consultant when it provided erroneous reports about the performance of the investment managers of the fund, recommended investment managers who would agree to place trades through Citigroup, and engaged in self-dealing transactions with assets of the fund. Citigroup moved to compel arbitration on the ground that William Adams, the chairman of the Board, had bound the Board to arbitrate any dispute with Citigroup when he signed several account agreements through which one of the investment managers of the fund could buy and sell securities. Those account agreements required arbitration of disputes under those and "any other agreement between" Citigroup and the Board. The Board argued that Adams had no authority to bind the Board to arbitrate disputes under the consulting contract, and Citigroup responded that Adams had both implied actual authority and apparent authority to bind the Board. The district court agreed with the Board, held that Adams had no authority to bind the Board to arbitrate, and denied the motion to compel arbitration. Because we conclude that Adams had

2

implied actual authority to bind the Board to arbitrate disputes arising under the consulting contract, we reverse and remand with instructions.

## I. BACKGROUND

We divide our discussion of the background of this appeal into three parts. First, we describe the decisions of the Board to hire Citigroup as its pension consultant and to delegate to Adams the authority to execute the account agreements. Second, we describe the lawsuit that the Board filed against Citigroup. Third, we describe the motion of Citigroup to compel arbitration and the decision of the district court to deny that motion.

### A. The Hiring of Citigroup and Execution of the Account Agreements

The Board manages a pension trust fund for the benefit of the firefighters and police officers of Delray Beach, Florida. See Fla. Stat. §§ 175.071, 185.06; Delray Beach, Fla., Code of Ordinances ch. 33, § 33.66. As the manager of the fund, the Board hires professional investment managers to select investments for the fund. By law, the Board must "retain a professionally qualified independent consultant who shall evaluate the performance of any existing professional money manager and shall make recommendations to the board of trustees regarding the selection of money managers for the next investment term." Fla. Stat. §§ 175.071(6)(a), 185.06(5)(a).

In October 1995, the Board hired Citigroup (formerly Salomon Smith Barney) as its pension consultant. The parties signed a pension consultant contract, which required Citigroup to report each quarter about the performance of the professional investment managers who made investments on behalf of the fund. The consulting contract required Citigroup to compute quarterly and annually the performance of the total fund and individual managers on no less than a quarterly basis; attend quarterly meetings; attend special meetings; and provide additional services agreed upon. The parties signed a materially similar contract in December 2000. When that contract expired in 2004, the parties, according to the complaint, "continued their relationship without a written contract, orally agreeing to operate on the same terms previously agreed upon."

The Board approved the consulting contract after consideration by the full Board. The Board discussed key provisions of the consulting contract, submitted the consulting contract to outside counsel Stephen Cypen for review and approval, and approved the consulting contract by a vote of the majority of the Board. The Board contends that, during negotiations of the consulting contract, the Board expressly refused to agree to arbitrate disputes under the consulting contract, but Citigroup denies that allegation. Even so, the final consulting contract did not contain an arbitration clause. The consulting contract provided, "Any changes to

4

this Agreement requested either by the Consultant or the Board may only be effected if mutually agreed upon in writing by duly authorized representatives of the parties hereto." It continued, "This Agreement shall not be modified or amended or any rights of a party to it waived except by such a writing."

At a meeting in November 2003, the Board decided to hire NWQ Investments as an investment manager. As the minutes from that meeting reflect, the Board agreed "that once Cypen has approved the NWQ contract, Chief Adams, Chairman, be given the authority to execute the contract on behalf of the Board/Fund." Cypen approved the NWQ contract and Adams signed an agreement with NWQ. According to Citigroup, the Board needed to open an investment account through which NWQ could invest assets of the fund on behalf of the Board and, although the Board could have opened this account with any institution, the Board chose to open it with Citigroup. On December 19, 2003, Adams executed several documents to open this account. In October 2004, Adams signed several similar documents to open a similar account, also with Citigroup, for another investment manager of the Board.

The account agreements contain a broad arbitration clause. Above the signature block, the account agreements state, "I acknowledge that I have received the Client Agreement which contains a pre-dispute arbitration clause." The client

5

agreement, in turn, contains a clause that requires arbitration of "all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between me and [Citigroup]." The client agreement requires arbitration of disputes "concerning or arising from . . . the construction, performance or breach of this or any other agreement between us."

### B. Lawsuit Against Citigroup

In November 2008, the Board sued Citigroup in a Florida court. The complaint stated four claims. Each claim alleged misconduct by Citigroup as pension consultant to the Board.

Count one alleged that Citigroup breached the consulting contract "by failing to provide the services for which it was paid." Citigroup "computed the performance of the Fund and the investment managers gross of fees, rather than net of fees, and repeatedly submitted false and misleading information to the Board concerning matters relevant to evaluating the Fund's investment performance." The complaint alleged, "These matters included, without limitation, the actual rate of return on the Fund's investments as compared with a purportedly appropriate benchmark rate of return, and the amount of appreciation in the Fund's securities portfolio." The complaint requested compensatory damages on the ground that the Board paid for services never performed and that if the Board had been aware of

6

the real performance of the pension fund, it would have terminated Citigroup, hired a new consultant, and achieved a better rate of return. Moreover, the complaint alleged that Citigroup "utilized its position as pension consultant to engage in transactions involving Fund assets through which [it] was able to obtain much larger compensation from its relationship with the Board and the Fund than the amount to which it was entitled under the" consulting contract.

Count two alleged breach of fiduciary duty. It alleged that a fiduciary relationship existed between Citigroup and the Board because Citigroup "induced the Board to place its trust and confidence in [Citigroup], and [Citigroup] assumed a role of superiority in its relationship to the Board with respect to the areas of its purported expertise and exerted influence over the Board." The Board alleged that Citigroup breached its duties as fiduciary by, among other things, repeatedly misleading the Board about the performance of its investments and recommending that it hire investment managers who Citigroup knew would agree to run securities trades through it as broker so that it could earn commissions. The complaint also alleged that Citigroup breached its fiduciary obligations by "repeatedly entering into fixed income and equity trades with the Fund for its own account without disclosing to the Board that it was trading as a principal, earning undisclosed profits from those trades, and periodically failing to provide these trades to the

7

Fund at current market rates."  Additionally, Citigroup "directed certain of the Fund's investment managers to run all their portfolio trading for the Fund through [Citigroup] without Board approval."  The complaint again requested compensatory damages.

Count three alleged fraud.  The complaint alleged that Citigroup made false statements to the Board concerning the performance of the pension fund by, for example, "reporting . . . performance gross of fees and overstating the appreciation of the Fund's investment portfolio over a seven-year period."  It also alleged that Citigroup produced false and misleading quarterly and annual reports on which the Board relied in deciding to retain Citigroup as consultant and to retain various of its investment managers as managers of the assets of the fund.  It also alleged that Citigroup fraudulently induced the Board to hire investment managers that would run trades through Citigroup as broker.  The complaint requested compensatory damages.

Finally, count four alleged negligent misrepresentation.  The Board alleged that Citigroup negligently submitted inaccurate reports about the performance of the pension fund by reporting returns gross of fees, not net of fees as required by Florida law; misrepresenting the actual performance of the pension fund; and misrepresenting the appreciation of the assets of the fund.  The complaint again

8

sought compensatory damages on the ground that the negligence of Citigroup caused the Board to retain an ineffective pension consultant and investment managers that were underperforming the market.

### C. Motion to Compel Arbitration

In December 2008, Citigroup removed the action to federal court, 28 U.S.C. §§ 1332, 1441, 1446, and promptly moved to compel arbitration. It relied on the arbitration clause contained in the account agreements that Adams signed in connection with the hiring of NWQ as an investment manager. The motion to compel arbitration recounted the facts that we have described and stated that "[i]n connection with its relationship with [Citigroup], the Board opened investment accounts with [Citigroup] in which the fixed income and equity securities transactions the Board now complains about were executed on behalf of the Fund." Citigroup also stated that, when opening these accounts, "the Board entered into client agreements which contain broadly worded arbitration provisions that clearly encompass the claims asserted by the Board in this action." Citigroup argued that the broad arbitration clause covered the claims of the Board "because they concern or arise from accounts the Board maintained with [Citigroup], transactions involving [Citigroup], the performance or breach of the Board's agreements with [Citigroup,] and alleged duties arising from the business of [Citigroup]."

9

The Board argued that it never agreed to arbitrate disputes under the consulting contract. The Board argued that Adams lacked "actual authority" to agree to arbitrate claims arising under the Board-approved consulting contract because the Board had never voted to give him that authority. It argued that Florida law requires "all acts and decisions [of the Board to] be effectuated by vote of a majority of the members of the board," Fla. Stat. §§ 175.071(2), 185.06(2), and it observed that the Board "never voted to modify or amend the Pension Consultant Contracts by adding an arbitration clause to them" and that the consulting contract stated that it could not be modified except in writing by "duly authorized representatives of the parties." The Board also argued that Adams did not have "apparent authority" to subject claims under the consulting contract to arbitration because the Board did nothing at all to suggest to Citigroup that Adams had any authority to modify the consulting contract. The Board argued, "Rather than causing [Citigroup] to believe that Mr. Adams was authorized to amend the Pension Consultant Agreements, [the Board] included [Citigroup] in the very meetings that confirmed that Mr. Adams was not so authorized." According to the Board, because Citigroup representatives attended the meetings at which the full Board debated the substance of the consulting contract, agreed to submit a draft of the consulting contract to outside counsel for approval, and then approved the final

10

consulting contract by majority vote, Citigroup knew that the Board would not have given Adams the authority to alter the consulting contract by executing the separate NWQ contract. The Board further argued that the "customary practice" of Citigroup of alerting Adams to the need for Board or outside counsel review of substantive documents that required Adams's signature supported a ruling that Citigroup could not have reasonably thought that Adams could amend the consulting contract without involving the Board.

The district court denied the motion to compel arbitration. The district court considered whether Adams had actual authority to execute the account agreements that contained the arbitration clause instead of whether he had actual authority to bind the Board to arbitrate disputes under the consulting contract. The district court stated that it had located no "Florida case in which a member of the board of a police or firefighter pension trust fund was able to bind the Board via unilateral action." It concluded, "Absent any authority that would allow this Court to overlook application of the previously cited Florida statutes [stating that the Board acts through majority vote], the Court concludes that Adams lacked actual authority to execute the Account Agreements." The district court also held that Adams lacked apparent authority to execute the account agreements. The court held that "[g]iven [Citigroup's] presence at the previously mentioned Board

11

meetings, [Citigroup] knew that Adams could not sign the Account Agreements without approval of the Board and its counsel." Alternatively, the district court held that, even if Adams had apparent authority to sign the account agreements because the Board held him out as having that authority, the Florida laws that provide that the Board manages the pension fund by majority vote prevent the operation of ordinary principles of agency.

## II. STANDARD OF REVIEW

We review the denial of a motion to compel arbitration de novo. Becker v. Davis, 491 F.3d 1292, 1297 (11th Cir. 2007).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that Florida law permitted the Board to delegate to Adams authority to bind it to arbitrate disputes under the consulting contract. Second, we explain that Adams possessed implied actual authority to bind the Board to arbitrate disputes under the consulting contract.

### A. Florida Law Permitted the Board to Delegate to Adams the Authority to Bind the Board to Arbitration Under the Consulting Contract.

Citigroup contends that ordinary principles of administrative law permit the Board to delegate to Adams, its agent, the authority to bind the Board to arbitrate disputes under the consulting contract. The Board disagrees, and advances a

related argument that the Florida Sunshine Law, Fla. Stat. § 286.011(1), prevented the Board from delegating authority because, under that law, all decisions affecting the Board must be made at a public meeting. We agree with the argument of Citigroup that Florida law permitted the Board to delegate to Adams the authority to agree to arbitrate disputes under the consulting contract.

Citigroup argues persuasively that general principles of administrative law govern the Board, which is a municipal agency; those general principles of administrative law permit delegation; and because no Florida law prohibits the sort of delegation at issue, the Board could delegate its authority. The Board has offered no reason to doubt this argument about Florida law. Cf. W.M. Schlosser Co. v. Sch. Bd. of Fairfax Cnty., Va., 980 F.2d 253, 258 (4th Cir. 1992) (holding that agent could not bind board to arbitrate because state law affirmatively prohibited arbitration); Morgan v. S. Bend Cmty. Sch. Corp., 797 F.2d 471, 479 (7th Cir. 1986) (holding that state law affirmatively required full board to approve employment contracts so superintendent modification was invalid). Delray Beach municipal law does not prohibit delegation. It instead permits the Board to "hire and appoint those persons, agents or entities . . . as in its discretion may be required or advisable to enable it to perform custodial and investment duties." Delray Beach, Fla., Code of Ordinances ch. 33, § 33.66(C). Florida municipal law also

13

permits the Board to carry out several enumerated investment powers "through duly authorized agents, provided that the Board at all times maintains continuous supervision over the acts of any agent."  Id. § 33.66(F).

Killearn Properties, Inc. v. City of Tallahassee forecloses the related argument of the Board that its alleged violation of the Florida Sunshine Law could excuse it from complying with the terms of any contracts that it might have given Adams the authority to execute, including the account agreements.  366 So. 2d 172, 181 (Fla. Dist. Ct. App. 1979).  That decision makes clear as follows that a government agency cannot benefit from its own violation of the Sunshine Law: "It is one thing for an aggrieved citizen to seek to have set aside an agreement between a government and another party because of Sunshine Law violations; but quite another for the government entity itself to seek to escape its obligation based upon its own alleged wrongdoing."  Id.  The Board does not explain why this decision is mistaken or identify any other Florida precedent that is inconsistent with it.  Consequently, the question before us is not whether the Board could have delegated to Adams the authority to bind it to arbitrate disputes under the consulting contract, but whether it did.

*B.  Adams Possessed Implied Actual Authority to Bind the Board to Arbitrate Disputes Under the Consulting Contract.*

14

We have explained that, as a matter of federal law, "arbitration is a matter of consent, not coercion." World Rentals & Sales, LLC v. Volvo Constr. Equip. Rents, Inc., 517 F.3d 1240, 1244 (11th Cir. 2008) (internal quotation marks omitted). "Accordingly, a party ordinarily will not be compelled to arbitrate unless that party has entered into an agreement to do so." Id. (internal quotation marks omitted). "[C]ommon law principles of contract and agency law allow a signatory . . . to bind a non-signatory . . . to an arbitration agreement . . . ." Id. (internal quotation marks omitted). This rule means that the Board, which has not signed an arbitration clause, may be compelled to arbitrate if a signatory executed the arbitration agreement as its agent. Id. at 1247.

The determination whether a signatory like Adams had the authority to bind a non-signatory like the Board to arbitrate "turns on the specific facts of each case." Id. at 1248. This issue is for us, not an arbitrator, to resolve, id., unless the parties have clearly delegated to the arbitrator responsibility for this determination, AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986). Contrary to the suggestion of Citigroup, we resolve this issue without a thumb on the scale in favor of arbitration because the "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." Fleetwood Enters., Inc. v. Gaskamp,

15

280 F.3d 1069, 1073 (5th Cir. 2002).

Citigroup contends that, under general principles of agency law, Adams had authority to execute the account agreements that contained a broad arbitration clause. It argues that, although the Board did not expressly authorize Adams to execute the account agreements, that power was implied in the express grant of authority to execute the NWQ contract. Citigroup maintains that the authority to execute the account agreements implied the authority to execute the arbitration clause contained in those agreements, which by its plain terms requires arbitration of the dispute at issue here.

The Board does not argue that the account agreements are invalid or that the arbitration clause is ineffective as to any dispute arising under those account agreements, but the Board does argue that the arbitration clause is invalid "with respect to the claims arising under the Pension Consultant Contract." The Board contends that it never provided Adams the authority "to amend the Pension Consultant Contracts by subjecting them to arbitration." We disagree with the Board.

Adams had implied authority to execute the account agreements. The Board expressly authorized Adams to execute the NWQ contract, and that grant of express authority implied "the authority to do acts that are incidental to it, usually

16

accompany it, or are reasonably necessary to accomplish it."  2 Fla. Jur. 2d <u>Agency & Employment</u> § 47 (2005) (citing Restatement (Second) of Agency § 35 (1958)).

In Florida, "[i]t is well-established that an agent's authority may be inferred from acts, conduct and other circumstances."  <u>Bradley v. Waldrop</u>, 611 So. 2d 31, 32 (Fla. Dist. Ct. App. 1992).  Under Florida law, an agent charged with selling property in "any way he could" possesses the implied authority to buy surveying services on behalf of his principal, <u>id.</u> at 32–33, and a real estate agent possesses the implied authority "to make representations concerning the description and characteristics of the property to be sold," <u>Outlaw v. McMichael</u>, 397 So. 2d 1009, 1010 (Fla. Dist. Ct. App. 1981).  For similar reasons, the express authority to hire a named investment manager implies the authority to open an account through which that manager can perform the only job that it was hired to perform.  <u>See</u> <u>Eassa Props. v. Shearson Lehman Bros., Inc.</u>, 851 F.2d 1301, 1304 (11th Cir. 1988).

Adams's authority to execute the account agreements also implied the authority to execute an arbitration clause that requires arbitration of disputes arising under those and all other agreements.  We have held that the "express authority to select and purchase bonds and to trade commodities on margin" implies the authority to execute account agreements through which those trades may be executed, which implies the authority to execute an arbitration clause

17

contained in those account agreements that will bind the principal.  Id.  Public

entities like the Board are subject to the same rule.  E.g., City of Vista v. Sutro &

Co., 52 Cal. App. 4th 401, 409-10, 60 Cal. Rptr. 2d 488, 492–93 (1997); see also

City of Hartford v. Am. Arbitration Ass'n, 174 Conn. 472, 479, 391 A.2d 137,

140–41 (1978).  Nothing suggests "that a customer agreement containing an

arbitration clause with a clearing house is unusual or out of the ordinary course of

business for the securities investment world."  99 Commercial St., Inc. v.

Goldberg, 811 F. Supp. 900, 907 (S.D.N.Y. 1993) (Sotomayor, J.).  There also is

nothing unusual about an arbitration clause, especially in an account agreement,

that requires arbitration of all disputes between the parties to the agreement.  We

have enforced such a clause before because it "evince[d] a clear intent to cover

more than just those matters set forth in the contract."  Belke v. Merrill Lynch,

Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir. 1982), overruled on other

grounds by Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 & n.3, 105 S.

Ct. 1238, 1240–41 & n.3 (1985); see also Coffey v. Dean Witter Reynolds, Inc.,

891 F.2d 261, 262–63 (10th Cir. 1989).  The Board cannot avoid the same result

because it acted through its agent.

Adams acted for the Board, and the Board is bound by "the plain meaning of

the agreement" that he signed.  99 Commercial St., 811 F. Supp. at 907 (binding

18

principal to arbitrate disputes under a customer agreement that it signed because a customer agreement that its agent later signed with the same party included an arbitration clause covering "all of a customer's accounts 'whether entered prior to, on or subject to the date hereof'"). Moreover, that the Board and Adams deny that Adams possessed the authority to agree to arbitrate disputes under the consulting contract does not determine the issue because "an agency relationship may be found even though the principal and the agent deny the existence of such a relationship." Bradley, 611 So. 2d at 33. The Board has offered no persuasive reason to conclude that it can avoid arbitration.

The dissent erroneously contends that Adams lacked implied authority to bind the Board to an arbitration clause because it was "clear that in the context of the consulting agreement to these parties such a clause was highly unusual." This argument overlooks a critical fact: the Board admits that Adams had the authority to execute the arbitration agreements and bind the Board to them. That is, the Board admits that it is contractually bound to resolve by arbitration any dispute arising out of the account agreements. The only argument of the Board is that we should ignore that half of the plain language of the arbitration agreements that also binds the Board to arbitrate disputes arising out of the earlier consulting agreement. What the dissent calls a "highly unusual" clause is instead nothing of the kind. We

19

refuse to rewrite the terms of the agreements exexuted by Adams so as to allow the Board to escape its obligation to submit its entire dispute to arbitration.

## IV.  CONCLUSION

Because the Board agreed to arbitrate its claims against Citigroup, the judgment of the district court is **REVERSED** and this appeal is **REMANDED** with instructions that the district court grant the motion of Citigroup to compel arbitration.

MARTIN, dissenting:

I agree with the Majority that this case turns on the existence and scope of the principal–agent relationship between the Board and Chairman Adams. I also agree that the Board intended to create an agency relationship and that in delegating to Chairman Adams the authority to execute the NWQ Investments contract, the Board empowered Chairman Adams to take incidental actions necessary to achieve that end. However, I cannot agree with the Majority's conclusion that this delegation empowered Chairman Adams to fundamentally amend unrelated and preexisting contractual relationships. Because such a result is neither consistent with the established doctrine of implied actual authority nor supported by the record before us, I respectfully dissent.

In short, I believe the Board delegated far less authority to Chairman Adams than does the Majority. Under the doctrine of implied actual authority, the scope of an agent's authority is limited to only that expressly conferred in the delegation itself, together with that which is incidental to, usually accompanies, or reasonably necessary to effect the principal's desired outcome. 2 Fla. Jur. 2d Agency & Employment § 47 (2010); Restatement (Third) of Agency § 2.02 cmt. d (2006) ("If a principal's manifestation to an agent expresses the principal's wish that something be done, it is natural to assume that the principal wishes, as an

incidental matter, that the agent take the steps necessary and that the agent proceed in the usual and ordinary way . . . ."); Union Camp Corp. v. Dyal, 460 F.2d 678, 687 (5th Cir. 1972) (invalidating sale of property by agent where sale was not incidental to the delegation and there was "no evidence that [the land owners] desired [the sales].").[1]

Based on these principles, the Majority's opinion is correct only if renegotiation of the unrelated Citigroup agreement was incidental to or necessary to effecting the NWQ Investments contract. The problem for the Majority is that the record does not support this conclusion. The Majority is thus left to argue that the decision of the district court should not stand because "there . . . is nothing unusual about an arbitration clause . . . that requires arbitration of all disputes between the parties to an agreement." Majority Op. 18. Never mind that the Majority's precedent for this point is readily distinguishable,[2] the record before us

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

[2] In particular, the Majority's reliance on 99 Commercial St., Inc. v. Goldberg, 811 F. Supp. 900, 907 (S.D.N.Y. 1993), is misplaced. See Majority Op. 18. In that case, then-Judge Sotomayor held that in agreeing to a broadly worded arbitration clause in a new account agreement, an agent subjected a previously opened account with the same brokerage company to arbitration. 811 F. Supp. at 907. Unlike in this case, however, the accounts at issue in 99 Commercial St. all related to a single mortgage transaction. Id. at 903. Further, it strikes me that the opinion does nothing to grapple with defining the scope of the agent's implied authority, suggesting that this issue was not even before the court. See id. at 907. Therefore, 99 Commercial St. does not speak to the crucial issue before us in this case, which is whether Chairman Adams possessed the requisite implied actual authority in the first place.

22

is clear that in the context of the consulting agreement to these parties such a clause was *highly* unusual. As a result, under the appropriate fact specific inquiry as to the scope of an agent's implied authority, see Gadsden County Tobacco Co. v. Corry, 137 So. 255, 257–58 (Fla. 1931); Bradley v. Waldrop, 611 So. 2d 31, 32 (Fla. 1st DCA 1992), I conclude that the Board did not delegate to Chairman Adams the authority to amend the preexisting consulting agreement.

The record is also clear that Chairman Adams lacked any apparent authority to amend the consulting contract. For apparent authority to have existed, the Board must have held Adams out as having the authority to amend the consulting contract and Citigroup must have reasonably relied on that appearance. See Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC, 993 So. 2d 86, 90 (Fla. 4th DCA 2008). To the extent that the Board held Chairman Adams out as having such authority, however, Citigroup's reliance, if any, was not reasonable. It was intimately involved in the Board's deliberations over the previously existing consulting contract and thus knew or should have known that Adams alone could not effectuate a material change to the contract by inserting an arbitration clause. See Palafrugell Holdings, Inc. v. Cassel, 940 So. 2d 492, 494 (Fla. 3d DCA 2006) (party seeking to rely upon the representations of an agent has duty to inquire further where representations are "facially contrary to the interests" of principal).

I am thus persuaded that Chairman Adams lacked the authority to insert the disputed arbitration provision into the preexisting consulting agreement. This being the case, the Board is not bound to arbitrate this or any other disputes arising from the underlying consulting agreement.[3]

For these reasons, I respectfully dissent from the Majority's opinion. Rather than overturn the well-reasoned conclusions of the district court, I would affirm that court's order and permit this action to proceed in district court. This result is not only consistent with the settled expectations of both parties, but more importantly is in accord with long settled principles of agency law that clearly limit the scope of the implied actual authority at issue here.

---

[3] By resolving this appeal on the issue of the scope of Chairman Adams's authority, I would not reach the question of whether Florida Sunshine Law or state and local administrative law deprived Adams of *legal* authority to amend the consulting contracts. See Majority Op. 14. However, to the extent this issue bears on the resolution of this case, I must express my reservations regarding the majority's reliance, id., on Killearn Properties, Inc. v. City of Tallahassee, 366 So. 2d 172, 181 (Fla. 1st DCA 1979). Both legally and factually, Killearn is distinguishable from the case before this Court. First, Killearn is actually a case about estoppel, not implied authority, see 266 So. 2d at 177–82, and therefore its guidance regarding Florida Sunshine Laws is limited at best. Second, the record in Killearn evinced substantial and detrimental reliance on the part of the plaintiff that is not found in the present case. Id. at 174. Thus, I do not agree that Killearn forecloses any arguments regarding the significance of the Florida Sunshine Law. See Majority Op. 14.