[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-11651
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 10, 2011
JOHN LEY
CLERK

D.C. Docket No. 4:06-cv-00042-WLS

BARBARA ELIZABETH LAWSON,
Individually and on behalf of a class of
all persons similarly situated,
JERRY LAWSON,
Individually and on behalf of a class of
all persons similarly situated,

Plaintiffs - Appellees,

versus

LIFE OF THE SOUTH INSURANCE COMPANY,
a corporation,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 10, 2011)

Before CARNES, PRYOR, and COX, Circuit Judges.

CARNES, Circuit Judge:

A rule of contract law is that one who is not a party to an agreement cannot enforce its terms against one who is a party. See Walsh v. Columbus, H.V. & A.R. Co., 176 U.S. 469, 479, 20 S.Ct. 393, 397 (1900); Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1169 (11th Cir. 2009); United States v. Puentes, 50 F.3d 1567, 1574 (11th Cir. 1995); 13 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 37:1 (4th ed. 1999) ("As a general rule, strangers to a contract acquire no rights under such a contract." (quotation marks omitted)). The right of enforcement generally belongs to those who have purchased it by agreeing to be bound by the terms of the contract themselves. Most legal rules have exceptions, however, and this rule is no exception to that rule of exceptions. In Arthur Anderson LLP v. Carlisle, ___ U.S. ___, 129 S.Ct. 1896 (2009), the Supreme Court noted that a nonparty to a contract may have the legal right to enforce its provisions "through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." Id. at 1902 (quotation marks omitted).

Life of the South Insurance Company contends that two of those exceptions—the third-party beneficiary doctrine and equitable estoppel—allow it

to compel Barbara and Jerry Lawson to arbitrate their disagreement with it under the terms of an arbitration clause in a contract to which the Lawsons were parties but Life of the South was not. The Lawsons do not want to arbitrate, preferring instead to proceed with the nationwide class action lawsuit they have pending against Life of the South arising out of the credit life insurance policy they purchased from it. They contend that Life of the South has no right to enforce against them the arbitration clause in the loan agreement, even though that agreement did lead them to enter into a separate credit life insurance contract with it. We agree with the Lawsons. This is a case where the general rule applies and the exceptions to it do not.

I.

In December 2002 the Lawsons purchased a used 2000 Chevrolet Blazer from a car dealership in Morrow, Georgia. To finance the purchase they entered into a loan agreement with the dealership. The dealership assigned the loan agreement to Chase Manhattan Bank.

The loan agreement required the Lawsons to pay monthly installments on the car for 60 months, but it granted them the right to pay off the loan early. It also contained a clause titled "Agreement to Arbitrate Disputes," which provided:

> A Dispute means any controversy or claim . . . arising from or relating to [the loan agreement]. The term Dispute includes, but is not limited

3

to, the negotiation or breach of [the loan agreement], or any aspect of the sale of the vehicle involving any Buyer, Co-Buyer, Seller or assignee, agent, employee, surety bonding company or insurer of any of these persons. . . . If any Dispute arises, <u>either you or we may choose to have the Dispute resolved by binding arbitration</u> . . . .

(emphasis added). The loan agreement defined "you" as "the Buyer" (Barbara Lawson) and "Co-Buyer" (Jerry Lawson) and "we" as "the creditor named above" (the car dealership), "after assignment, the creditor's assignee" (Chase Manhattan), and "any other assignee" (there were no other assignees). The arbitration clause also provided (gratuitously) "that this Agreement to Arbitrate Disputes shall be subject to and governed by the Federal Arbitration Act, 9 U.S.C. [§§] 1–10, as amended."

The loan agreement gave the Lawsons the option to purchase credit life insurance. The premium for the insurance was a one-time, up-front payment of $530.08, and that premium would be included in the total amount financed under the loan agreement for the purchase of the car. Opting to purchase the insurance, the Lawsons checked the appropriate box on the loan agreement.

In addition to checking that box on the form loan agreement with the car dealership, the Lawsons executed a separate credit life insurance policy agreement with Life of the South. The insurance policy provided that Life of the South would pay the balance the Lawsons owed on the car loan if either of the Lawsons died

4

before the loan was paid off. The total coverage at the time of execution was the original loan balance of $15,706.20, which included the insurance premium, but coverage would decrease each month to reflect the payments that the Lawsons made on the loan. Unlike the loan agreement between the Lawsons and the car dealership, the insurance policy agreement between the Lawsons and Life of the South did not contain an arbitration clause.[1]

The insurance policy provided that if the Lawsons paid off the loan early, they would be eligible for a refund of any remaining premium, which the policy referred to as the "unearned premium." The refund would be prorated based on the amount of time left on the original loan term. The Lawsons paid off the loan in April 2005, more than two-and-a-half years early. Life of the South made no effort to refund the unearned amount of the prepaid premium to the Lawsons.

In March of 2006, without having requested a refund from Life of the South or notifying it that they had paid off the loan, the Lawsons filed a nationwide consumer class action in Georgia state court against Life of the South. On behalf of themselves and the purported class, the Lawsons sought a refund of the unearned premium due under the insurance policy because of the early termination

---

[1]The reason it did not is worth mentioning. Under Georgia law, arbitration agreements in contracts of insurance, including credit insurance policies, are unenforceable. See Ga. Code Ann. § 9-9-2(c)(3), see also McCarran-Ferguson Act, 15 U.S.C. § 1012(b).

5

of the loan, as well as damages under several contract and tort theories, injunctive relief requiring Life of the South "to ensure that in the future insureds . . . receive [their] refunds," and attorney's fees. The purported class included all United States residents "who have been or will be insured under a Life of the South credit insurance policy" and "whose underlying loan stopped or could stop" before the end of the loan term, and "who were not paid or might not be paid a refund." The class allegedly numbers in the "hundreds of thousands."

Life of the South filed a motion to compel arbitration based on the arbitration clause in the loan agreement, which provided Chase Manhattan, the car dealership, and the Lawsons the right to force arbitration of any dispute arising from or relating to that agreement. The arbitration clause in the loan agreement provided that "[n]o class action arbitration may be ordered under this Agreement to Arbitrate Disputes," cf. AT&T Mobility LLC v. Concepcion, ___ U.S. ___, 131 S.Ct. 1740, 1747 (2011), which, given the class action settlements in cases against other credit insurers involving this same issue, makes the arbitration issue a high stakes one.[2]

---

[2] According to Life of the South, the law firm representing the Lawsons has been quite successful in bringing claims like these in class action lawsuits. See Reply Brief of Appellant at 1 & n.3. The firm's website boasts that in similar class actions it has filed against other credit insurers it has obtained settlements of $49 million, $45 million, and $27.5 million. See http://www.butlerwooten.com/Results/Class-Action-Cases.shtml (last visited July 18, 2011); see also Joint Motion for Final Certification of a Settlement Class, Final Approval of Class

Life of the South removed the lawsuit to a federal district court under the Class Action Fairness Act, 28 U.S.C. §§ 1711 et seq. and 28 U.S.C. § 1332(d), bringing with it the motion to compel arbitration. The district court eventually denied the motion to compel arbitration. This is Life of the South's appeal from the denial of that motion. See 9 U.S.C. § 16(a)(1)(B) ("An appeal may be taken from an order . . . denying a petition [under the FAA] to order arbitration to proceed . . . .").

## II.

We review de novo the district court's denial of a motion to compel arbitration. MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 946 (11th Cir. 1999).[3] To determine which disputes between the parties to an enforceable arbitration agreement are covered by the language of the arbitration clause, we

_____

Settlement, and Request for Permanent Injunction and Final Dismissal at 4 n.2, Perkins v. American Nat'l Ins. Co., No. 3:05-CV-100-CDL (M.D. Ga. Jan. 7, 2009). The results of those other class action lawsuits explain why Life of the South favors arbitration, but they are irrelevant to the issue of whether it has the legal right to force the Lawsons to arbitrate, which is all that is before us.

[3]Because our review is de novo, we need not decide the arbitration issue on the same basis that the district court did, and we don't. The district court concluded that Life of the South could not force the Lawsons to arbitrate because it found that the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), reverse preempted the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and under Georgia law, arbitration clauses between insurers and insureds are unenforceable. Without reaching that theory or implying any view about it, we reach the same result on another ground. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (noting that we may affirm the district court's judgment on any ground that finds support in the record).

"apply[] the federal substantive law of arbitrability," which is "applicable to any arbitration agreement within the coverage of the FAA." Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, (1985)). That inquiry "must be addressed with a healthy regard for the federal policy favoring arbitration," Picard v. Credit Solutions, Inc., 564 F.3d 1249, 1253 (11th Cir. 2009) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S.Ct. 1647, 1652 (1991)), and we must "rigorously enforce agreements to arbitrate," Klay, 389 F.3d at 1200 (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242 (1985)).

Still, "arbitration is a matter of contract [and] the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." Klay, 389 F.3d at 1200. An exception to that rule is that a nonparty may force arbitration "if the relevant state contract law allows him to enforce the agreement" to arbitrate. Arthur Anderson LLP v. Carlisle, ___ U.S. ___, 129 S.Ct. 1896, 1903 (2009); cf. Bd. of Trs. v. Citigroup Global Mkts., Inc., 622 F.3d 1335, 1342–43 (11th Cir. 2010) (applying state contract law to determine if a nonsignatory to an arbitration clause could be compelled to arbitrate under agency principles).

8

As we have already mentioned, "traditional principles of state law" may allow "a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." Carlisle, 556 U.S. at ___, 129 S.Ct. at 1902 (quotation marks omitted). Many of this Court's decisions involving the question of whether a non-party can enforce an arbitration clause against a party have not made clear that the applicable state law provides the rule of decision for that question. See, e.g., Becker v. Davis, 491 F.3d 1292, 1299 (11th Cir. 2007); Blinco v. Green Tree Servicing LLC, 400 F.3d 1308, 1312 (11th Cir. 2005); In re Humana, Inc. Managed Care Lit., 285 F.3d 971, 976 (11th Cir. 2002), rev'd on other grounds, PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 123 S.Ct. 1531 (2003); MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993); McBro Planning and Dev't Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984). However, the Supreme Court's 2009 decision in Carlisle, which postdates all of those decisions of this Court, clarifies that state law governs that question, and to the extent any of our earlier decisions indicate to the contrary, those indications are overruled or at least undermined to the point of abrogation by Carlisle. See United States v. Sneed, 600 F.3d 1326,

9

1332 (11th Cir. 2010) ("[A] prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." (emphasis omitted)).

In this case, Life of the South contends that it can enforce the arbitration clause in the loan agreement, to which it was not a party, against the Lawsons who were parties, under two traditional state-law principles. Life of the South essentially argues that it can compel the Lawsons to arbitrate under their loan agreement with the car dealership because it is a third party beneficiary to that agreement's arbitration clause, or that it can do so under the doctrine of equitable estoppel. We disagree.

## A.

Georgia law applies in this case. See World Harvest Church, Inc. v. Guideone Mut. Ins. Co., 586 F.3d 950, 956 (11th Cir. 2009). Under it "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." Ga. Code Ann. § 9-2-20(b); U.S. Foodservice, Inc. v. Bartow Cnty. Bank, 685 S.E.2d 777, 779 (Ga. Ct. App. 2009). Third-party beneficiaries have standing to enforce contracts intended for their benefit. U.S. Foodservice, 685 S.E.2d at 779. "There must be a promise by the promisor to the promisee to render some performance to a third person," Danjor,

Inc. v. Corporate Constr., Inc., 613 S.E.2d 218, 221 (Ga. Ct. App. 2005), and "the contracting parties' intention to benefit the third party must be shown on the face of the contract." Donnalley v. Sterling, 618 S.E.2d 639, 641 (Ga. Ct. App. 2005).

The scope of the arbitration clause in the loan agreement between the car dealership and the Lawsons is broad, even expressly referring to disputes involving the Lawsons' "insurer," but the right to enforce that clause is clearly limited to the Lawsons, the car dealership, Chase Manhattan, and any assignees of the car dealership or Chase Manhattan. (Life of the South does not contend that it is an assignee.) The arbitration clause in the loan agreement is not mandatory; it does not require that every dispute falling within its scope be arbitrated. Instead, the clause provides that "[i]f any Dispute arises, either you or we may choose to have the Dispute resolved by binding arbitration." On its face, the loan agreement grants only "you" (defined as the Lawsons) and "we" (defined as the car dealership, Chase Manhattan, and their assignees) the right to elect to arbitrate. Life of the South is neither a "you" nor a "we." Instead, in pronoun terms, Life of the South is an unmentioned "it," and the face of the arbitration clause does not show an intent to give "it" the right to compel arbitration. The loan agreement does not show, on its face or elsewhere, an intent to allow anyone other than the Lawsons, the car dealership, Chase Manhattan, and the assignees of the dealership

11

or Chase Manhattan to compel arbitration of a dispute, and Life of the South is none of those.

B.

Life of the South also contends that it can compel the Lawsons to arbitrate under the doctrine of equitable estoppel, which Georgia law also recognizes as an exception to the general rule that only the parties who agree to be bound by a contract's terms can enforce them. See Helms v. Franklin Builders, Inc, 700 S.E.2d 609, 612 (Ga. Ct. App. 2010). Equitable estoppel allows a nonsignatory to an arbitration agreement to compel or to be compelled by a signatory to arbitrate under certain circumstances in which fairness requires doing so. See Order Homes, LLC v. Iverson, 685 S.E.2d 304, 310 (Ga. Ct. App. 2009) (applying equitable estoppel where the plaintiffs were bringing claims arising out of the contract against nonsignatories, while attempting to avoid the contract's arbitration clause); see also In re Humana, 285 F.3d at 976 ("In all cases, the lynchpin for equitable estoppel is equity, and the point of applying it to compel arbitration is to prevent a situation that would fly in the face of fairness." (quotation marks and citations omitted)). Georgia courts have applied equitable estoppel in cases in which "the signatory to a written agreement . . . must rely on the terms of the written agreement in asserting its claims against the

12

nonsignatory." Autonation Fin. Servs. Corp. v. Arain, 592 S.E.2d 96, 100 (Ga. Ct. App. 2003) (quotation marks and alteration omitted) (quoting MS Dealer, 177 F.3d at 947).[4]

Life of the South argues that the equitable estoppel exception fits because the Lawsons' claims arising from their credit life insurance policy agreement with it "make reference to" and "presume the existence of" the loan agreement containing the arbitration clause. See Arain, 592 S.E.2d at 100 (quoting MS Dealer, 177 F.3d at 947). The Lawsons' complaint does refer to the loan agreement several times and the claims depend on the existence of that agreement because without it, and the Lawson's obligation under it to pay off the loan, there would be no credit life insurance policy with Life of the South and no premium refund due because the loan was paid off early. It follows, Life of the South argues, that the Lawsons' claims against it "arise out of" the loan agreement, which they must rely on to assert those claims.

That is not a bad argument, but it is not a good enough one to prevail. Under Georgia law, a plaintiff's claims must directly, not just indirectly, be based

---

[4] Georgia courts have also applied equitable estoppel to situations in which a signatory to a contract asserts a claim against a nonsignatory that includes "allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Arain, 592 S.E.2d at 100 (quotation marks and alteration omitted) (quoting MS Dealer, 177 F.3d at 947). That is not the situation here.

on the contract containing the arbitration clause in order for equitable estoppel to compel arbitration of those claims. See Arain, 592 S.E.2d at 101 (holding that equitable estoppel is justified because the plaintiff "asserts only one . . . claim, and the allegations supporting that claim are tied directly to the [contract containing the arbitration clause]"). What is required is illustrated in LaSonde v. CitiFinancial Mortg. Co., 614 S.E.2d 224 (Ga. Ct. App. 2005). In that case there were two plaintiffs, Mary and Jack LaSonde, who were suing CitiFinancial over a promissory note that Jack had signed but Mary had not. See id. 113–14. The two of them alleged that CitiFinancial had breached the terms of the promissory note and a related security deed on their house. Id. at 114. The promissory note contained an arbitration clause that incorporated an arbitration agreement. Id. at 113. Mary argued that she could not be compelled to arbitrate because she had not signed the promissory note or the arbitration agreement that it incorporated. Id. at 114. Her argument was rejected and she was required to arbitrate because she, along with her husband, claimed: "that CitiFinancial's foreclosure proceedings breached the promissory note and security deed. They further claim[ed] that Jack's default under the promissory note, as well as the resulting foreclosure authorized by the note and security deed, are void. All of these allegations [arose] at least in part from the promissory note Jack signed." Id. at 115. Having staked

14

her claims on the promissory note, Mary was bound by the doctrine of equitable estoppel to abide by the arbitration agreement that was part of that note. See id.

By contrast, in this case the loan agreement is not the legal basis for the Lawsons' claims against Life of the South. Their complaint does refer to the loan or indebtedness twelve times—but only because it is factually significant. Its factual significance, however, is simply that it establishes that the Lawsons had a loan and that they paid it off early. The legal basis of their claims, on the other hand, is the obligation that the credit life insurance policy, a separate agreement, places on Life of the South to refund any unearned premium amount due to the Lawsons because they repaid the loan early. So far as we can tell, there is no legal dispute about whether the loan agreement permitted the Lawsons to repay their loans early, nor is there any genuine factual dispute about whether they did so. The dispute instead arises from Life of the South's legal obligations under the credit life insurance policy to refund the unearned premium amount. The claims are that it did not discharge those legal obligations. And contrary to Life of the South's argument, the fact that the Lawsons' complaint makes reference to and presumes the existence of the loan agreement does not mean that the Lawson's loan agreement with the dealership, or their obligations under that agreement, are the legal basis for their claims.

15

While there is language in the Arain opinion supporting Life of the South's "make reference to" argument, that language in the opinion, when read against the facts and result in that case, is not the holding. The Georgia appellate court did not hold in Arain that equitable estoppel applies whenever a claim makes reference to and presumes the existence of an agreement that contains an arbitration clause. Arain was a car buyer suing the dealership and a theft protection service company for misrepresentations that the dealership had made in connection with Arain's purchase of a "Theft Protection Program," which he had financed through the dealership along with the purchase of his car. Arain, 592 S.E.2d at 97. The complaint asserted a Georgia RICO claim against both the dealership and the theft protection company for misrepresentations the dealership had made about the theft protection program. Id. Of critical importance, the complaint sought to recover the finance charges on the amount of the loan Arain had used to purchase the theft protection program, and Arain had paid those finance charges directly to the dealership under the terms of his loan agreement with it. Id.

Both the dealership and the theft protection company moved to compel arbitration. Id. The loan agreement with the dealership contained an arbitration clause, but the separate agreement Arain had signed with the theft protection

16

company did not.  Id.  Apparently to avoid the arbitration clause, Arain voluntarily dismissed the dealership as a defendant.  Id.  Because his separate agreement with the theft protection company, the only remaining defendant, did not contain an arbitration clause, the trial court denied the company's motion to compel arbitration.  Id.

In reviewing the denial of the motion to compel arbitration, the Georgia Court of Appeals concluded that "Arain's claims are sufficiently related to the [loan agreement with the dealership] to justify equitable estoppel."  Id. at 101.  It based that conclusion on the fact that "the allegations supporting that claim are tied directly to the [loan agreement with the dealership]."  Id. (emphasis added). The court pointed out that Arain claimed that the amount he had paid for the theft protection program was excessive and that the allegedly excessive amount was financed as part of his loan agreement with the dealership.  Id.  Not only that, but "Arain [was] seeking to recover the finance charges he paid under [the loan agreement with the dealership]."  Id.  Only then, and only in that context, did the court state that "Arain's claim 'makes reference to and presumes the existence of' the [theft protection program] charge contained in the [loan agreement with the dealership] and 'depends entirely upon [his] contractual obligation to pay' the fee."  Id. (emphasis added) (quoting MS Dealer, 177 F.3d at 947–48).  That

17

contractual obligation, of course, was contained in the same contract that contained the arbitration clause: Arain's loan agreement with the dealership.

In the present case, by contrast, the allegations supporting the Lawsons' claims are not "tied directly" to the loan agreement, which is the contract containing the arbitration clause. The claims for refund of the unearned premium are not based on any misrepresentations made by the dealership or any other conduct that occurred during the purchase of the vehicle or the execution of the loan agreement by the dealership and the Lawsons. Nothing in the Lawsons' complaint alleges that the credit insurance premiums financed as part of the car purchase were excessive or otherwise unlawful. And perhaps most importantly, the Lawsons, unlike Arain, do not seek to recover finance charges or interest they paid under the loan agreement on their credit life premium. What they complain about—that Life of the South improperly failed to refund the unearned premium that was due under the credit insurance policy— happened only after the loan and any interest on it had been paid in its entirety; the loan agreement was no longer in the picture. While the Lawson's claims do make reference to and presume the existence of the loan agreement, there is nothing in their complaint to suggest that their claims "depend[] entirely" on any of their obligations under the loan

18

agreement, as the claim in Arain did. Because of that, Arain does not support Life of the South's equitable estoppel argument.

There is, to be sure, a "but-for" relationship between the loan agreement, which created the debt obligation, and the credit life insurance policy that gave rise to the Lawsons' claims against Life of the South. But that alone is not enough to warrant equitable estoppel. If it were, every credit insurer could use an arbitration clause in the underlying credit agreement to compel its insureds to arbitrate disputes arising from their credit life insurance contracts, despite the absence of an arbitration clause in those contracts, and even though state law prohibited an insurer from including an arbitration clause in any of its insurance contracts. See, e.g., Ga. Code Ann. § 9-9-2(c)(3); Kan. Stat. Ann. § 5-401; Mo. Ann. Stat. § 435.350.

In sum, the Lawsons, in seeking relief from Life of the South, did not assert any claims based on the terms of their loan agreement with the car dealership, which contained an arbitration clause. Because the only claims they asserted were based on the terms of their credit life insurance policy with Life of the South, which did not contain an arbitration clause, equitable estoppel does not allow Life of the South to compel the Lawsons to arbitrate.[5]

---

[5]Although not applying Georgia law and not binding on this Court, the decisions of a couple of other circuits that have addressed this issue are in accord with our conclusion that

**AFFIRMED.**

---

equitable estoppel does not apply where a credit life insurer is attempting to compel arbitration of a dispute over the terms of the insurance policy under an arbitration clause contained in the underlying credit agreement.  See Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1047 (9th Cir. 2009) (holding equitable estoppel did not apply because the claim was neither "intertwined with" the credit agreement that provided for arbitration, nor did it "arise out of or relate directly to" the credit agreement (quotation marks and alterations omitted)); Brantley v. Republic Mortg. Ins. Co., 424 F.3d 392, 396 (4th Cir. 2005) (holding equitable estoppel did not apply because "the mere existence of a loan transaction requiring plaintiffs to obtain [credit] insurance cannot be the basis for finding their . . . claims, which are wholly unrelated to the underlying [credit] agreement, to be intertwined with that contract," and "the plaintiffs never attempted to rely on the [credit] contract to establish their claims" (quotation marks and alteration omitted)).

PRYOR, Circuit Judge, concurring:

I concur in the result, but for a different reason. I agree with the majority that in Arthur Andersen LLP v. Carlisle, 556 U.S. --, 129 S. Ct. 1896 (2009), the Supreme Court clarified that state law, not federal law, governs whether a nonparty can enforce an arbitration clause against a party, but I doubt the conclusion of the majority that, under Georgia law, equitable estoppel does not apply. I would resolve this appeal on the same ground as the district court: that the Georgia Arbitration Act bars enforcement of the arbitration clause in this dispute about insurance.

The majority opinion concludes that "a plaintiff's claims must directly, not just indirectly, be based on the contract containing the arbitration clause in order for equitable estoppel to compel arbitration of those claims," Maj. Op. at 14, but I am less confident that the Georgia courts apply that rule, regardless of its logical appeal. Georgia courts have applied several times a rule articulated by this Court in MS Dealer Service Corp. v. Franklin: "When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written] agreement,' and arbitration is appropriate." 177 F.3d 942, 947 (11th Cir. 1999) (alterations in original) (quoting Sunkist Soft Drinks, Inc. v. Sunkist

21

Growers, Inc., 10 F.3d 753, 758 (11th Cir. 1993)).  See Order Homes, LLC v. Iverson, 685 S.E.2d 304, 310 (Ga. Ct. App. 2009); Price v. Ernst & Young, LLP, 617 S.E.2d 156, 159–60 (Ga. Ct. App. 2005); LaSonde v. CitiFinancial Mortg. Co., 614 S.E.2d 224, 226 (Ga. Ct. App. 2005); Lankford v. Orkin Exterminating Co., 597 S.E.2d 470, 474 (Ga. Ct. App. 2004); Autonation Fin. Servs. Corp. v. Arain, 592 S.E.2d 96, 99–101 (Ga. Ct. App. 2003).  Life of the South bases its argument on this rule.

The Court of Appeals of Georgia applied equitable estoppel in Arain, 592 S.E.2d at 99–101, and held that a seller of a theft protection program could compel arbitration even though it was not a signatory to the contract containing the arbitration provision.  The plaintiff in Arain bought a car and financed both the car and the theft protection program through an installment sales contract containing an arbitration provision.  Id. at 97.  The court looked to factors also present in this appeal: "The complaint asserts that [Arain's] purchase of the [theft protection program] occurred '[i]n the course of' [the] sale of the car to him," id. at 101 (third alteration in original), and "[t]hat charge was financed through the installment contract, which, in effect, facilitated the [theft protection program] purchase by allowing Arain to pay in installments.  And Arain is seeking to recover the finance charges he paid under that contract," id.  The court explained that "Arain's claims

22

are sufficiently related to the arbitration contract in this case to justify equitable estoppel," id., because the claims "'make[] reference to and presume[] the existence of' the [theft protection program] charge contained in the installment contract," id. (quoting MS Dealer, 177 F.3d at 947–48); see also Price, 617 S.E.2d at 160.

Arain suggests that Georgia courts might conclude that the Lawsons are equitably estopped from asserting the nonsignatory status of Life of the South to avoid arbitration. The Lawsons' complaint "makes reference to" and "presumes the existence of" the loan agreement. As the majority opinion correctly observes, the Lawsons' complaint refers to the loan agreement several times and their claims depend on the existence of that agreement. The Lawsons allege that their damages include the "unearned premium that was not refunded," and that premium was financed under the loan agreement. Besides the references to the loan agreement in the complaint, several other facts establish a connection between the two agreements: the loan agreement contains a section entitled "Optional Credit Insurance," which the Lawsons signed to purchase a credit life insurance policy "under this Contract"; the loan agreement lists the amount of the premium paid by the Lawsons to purchase the insurance; the loan financed the payment of the premium; and the arbitration provision of the loan agreement states that it covers

23

"any controversy or claim . . . arising from or relating to this Contract," including claims related to "any aspect of the sale of the vehicle involving any Buyer, Co-Buyer, Seller, or . . . insurer of any of these persons."

It is true, as the majority explains, that Arain sought to recover finance charges paid under his loan agreement, but the Lawsons' complaint might be read that way too. In their requests for tort remedies, the Lawsons complain that they "have suffered special damages in the amount of the unearned premium that was not refunded, plus the interest on those sums." It is not clear from the face of their complaint whether the phrase "the interest on those sums" refers to the interest charged under the loan agreement or some form of prejudgment interest under Georgia law.

It is also true, as the majority explains, that the alleged liability of Life of the South arose after the Lawsons had paid the amounts owed under the loan agreement, but Arain likewise sued the nonsignatory after Arain had paid the charges for the theft protection program that he alleged were excessive. Arain did not allege a breach of the loan agreement, and his complaint for damages against the nonsignatory accrued after he had made the payments required by that agreement.

Even if the majority is correct that the relationship between the complaint and the contract containing the arbitration clause was more direct in Arain than the relationship between the Lawsons' complaint and the loan agreement, that fact does not establish that Georgia courts would refuse to apply equitable estoppel in this appeal. The majority has not cited a Georgia precedent that held that the relationship between a complaint and an arbitration agreement was too indirect to allow a nonsignatory to enforce the arbitration agreement. The majority dismisses the language in Arain that supports the argument of Life of the South as dicta, but without a decision from a Georgia court that is directly on point, the dicta of Arain tells us more about how a Georgia court would decide this appeal than our supposition.

The majority concedes that the Lawsons' complaint makes reference to and presumes the existence of the loan agreement, Maj. Op. at 13, but the majority concludes that the Lawsons' complaint is nevertheless not tied directly to that agreement. The problem with that conclusion is that the decisions of the Georgia courts state that, when a complaint makes reference to and presumes the existence of an agreement with an arbitration clause, then the complaint is related to the agreement. The Georgia precedents do not describe "directly related" issue as a separate element of equitable estoppel. The Georgia precedents instead describe

25

the test of direct relation as being satisfied by the formulation from <u>MS Dealer</u> about referring to and presuming the existence of the arbitration agreement: that is, the complaint "arise[s] out of and relate[s] directly to the [written] agreement," when the complaint "make[s] reference to or presume[s] the existence of the written agreement," with the arbitration clause, 177 F.3d at 947 (third alteration in original). See <u>Iverson</u>, 685 S.E.2d at 310; <u>Price</u>, 617 S.E.2d at 160; <u>LaSonde</u>, 614 S.E.2d at 226; <u>Arain</u>, 592 S.E.2d at 99-101.

Regardless of whether Georgia courts would apply equitable estoppel in this circumstance, Life of the South cannot compel arbitration for a different reason. Although the Federal Arbitration Act provides that agreements to arbitrate are ordinarily enforceable, 9 U.S.C. § 1 <u>et</u> <u>seq.</u>, the Georgia Arbitration Act excepts from enforcement agreements to arbitrate disputes involving "contract[s] of insurance," Ga. Code Ann. § 9-9-2(c)(3). Because that state law "relates to the business of insurance," the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), makes it enforceable. In a decision where we addressed the intersection of these three statutes, we ruled that "the McCarran-Ferguson Act excepts § 9-9-2(c)(3) from preemption by the Federal Arbitration Act." <u>McKnight v. Chi. Title Ins. Co.</u>, 358 F.3d 854, 859 (11th Cir. 2004). Since <u>McKnight</u>, the Supreme Court of Georgia also has ruled that "the [McCarran-Ferguson Act] precludes the [Federal

26

Arbitration Act] from requiring the arbitration of disputes involving insurance" in Georgia. <u>Love v. Money Tree, Inc.</u>, 614 S.E.2d 47, 50 (Ga. 2005).

Life of the South contends that the Georgia Arbitration Act applies only to arbitration provisions that appear in contracts for insurance, but the Georgia Supreme Court has not applied the Georgia Arbitration Act that narrowly. The arbitration agreement in <u>Love</u> appeared in a loan agreement and not in a separate "Voluntary Insurance Election Form," <u>id.</u> at 48, but the Georgia Supreme Court ruled that the Georgia Arbitration Act applied. The court explained that the Georgia Arbitration Act "provides that agreements to arbitrate disputes regarding 'contracts of insurance' are invalid in Georgia," <u>id.</u> at 49, and the Act applies to "arbitration of disputes involving insurance," <u>id.</u> at 50. Like <u>Love</u>, this dispute too involves insurance, and Georgia courts would apply the Georgia Arbitration Act even though the arbitration provision does not appear in the contract of insurance.

Life of the South also argues that the arbitration agreement has a choice-of-law provision that states that the Federal Arbitration Act will govern arbitration of any disputes, but no court has ever held that a choice-of-law provision can override a state law barring arbitration that is enforceable under the McCarran-Ferguson Act. The choice of law in an unenforceable agreement to arbitrate is irrelevant. Life of the South cannot have its cake in the form of the arbitration

27

agreement and eat it too by avoiding application of the McCarran-Ferguson Act. I agree with the district court that Georgia law prohibits arbitration of this dispute involving insurance.