**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S25G0922
Richard L. Jackson et al.
v.
Mark Stevenson et al.

On Writ of Certiorari from the Court of Appeals of Georgia
No. A24A1853

Argued: December 9, 2025 — Decided: May 19, 2026

LAND, Justice.

We granted certiorari in this case to consider the circumstances under which an entity that is not a signatory to an arbitration agreement can be compelled to arbitrate claims brought against it by a signatory entity under the doctrine of equitable estoppel and whether the arbitrator in this case exceeded his powers by requiring the nonsignatory to arbitrate. We conclude that, under the circumstances of this case, equitable estoppel cannot be applied to compel the nonsignatory entity to arbitrate and that the arbitrator exceeded his powers by doing so. We therefore reverse the judgment of the Court of Appeals affirming the trial court's order confirming the arbitration award against the nonsignatory party, see *Jackson v. Stevenson*, 374 Ga. App. 741 (2025), vacate the arbitration award against the nonsignatory party, and remand the case to the Court of Appeals for further proceedings consistent with this opinion.

1. *Background and Procedural History*

The relevant facts, as summarized by the Court of Appeals,

are as follows:

> The record shows that respondent Jackson and claimant Stevenson, through various companies that each owned, were members of a real estate development joint venture. The Jackson entities owned 70 percent of the venture and the Stevenson entities owned 30 percent.
>
> The venture was governed by two operating agreements[1] that contained identical sections requiring arbitration under the Federal Arbitration Act ("FAA")[2] of "[a]ny dispute, controversy or claim arising out of or relating to" the agreements. Under a separate consulting agreement, claimant Stevenson managed the operations of the venture.
>
> In 2022, the Jackson entities sought to terminate the venture. The operating agreements provided that the member who wanted to end the relationship could present a "Buy/Sell Notice" to the other member to buy them out or, at the other member's election, to sell their ownership interest to the other member. The operating agreements required the transaction to close within 90 days after the right to buy or sell had been exercised.

---

[1] The "Artisan Operating Agreement" was signed by Jackson on behalf of Artisan Built Parent, LLC and Naturewalk Development Company Parent, Inc. The "SAWS Operating Agreement" was signed by Jackson on behalf of SAWS Parent, LLC and JIG Real Estate, LLC ("JIGRE").

[2] 9 USC §§ 1-16 (1947).

The Jackson entities offered to buy out the Stevenson entities' interest for $3 million or to sell their own interest to the Stevenson entities for $7 million, along with the Stevenson entities paying debt owed by the venture. The Stevenson entities opted to buy out the Jackson entities. Less than a week later, Jackson informed Stevenson that he was terminating the consulting agreement for cause.

The Stevenson entities … filed a demand for arbitration with the American Arbitration Association under the arbitration clauses in the two operating agreements. The [Stevenson entities] named Jackson and his companies as respondents.

Initially, the [Stevenson entities] sought the arbitrator's supervision of the closing, but once the deadline for the closing had expired, they amended their statement of claim to allege that the [Jackson entities] had engaged in misconduct to foil the closing. The [Stevenson entities] asserted claims for, among other things, breach of contract, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duty. The [Jackson entities] filed a counterclaim seeking a declaration that their termination of the consulting agreement was for cause because of the [Stevenson entities]' mismanagement and fraud.

Eventually, the [Stevenson entities] sought to include RICSHA, another Jackson-owned company, as

a respondent.[3] The [Stevenson entities] alleged that the [Jackson entities] and RICSHA had conspired to deprive the venture of valuable assets that were part of the venture when the [Stevenson entities] agreed to buy the [Jackson entities]' interest for $7 million and that the value of the venture would be reduced by removal of those assets. The arbitrator ordered RICSHA to be added.[4]

After a six-day evidentiary hearing, the arbitrator issued a final award ruling partly in favor of the [Stevenson entities] and partly in favor of the [Jackson entities]. The arbitrator found that the [Stevenson entities]' management of the venture resulted in material financial loss, authorizing termination of the consulting agreement.

The arbitrator also found, however, that the [Jackson entities] breached the buy-sell provision in the operating agreements in two ways. First, the arbitrator found that the [Jackson entities] improperly adjusted the venture's finances by increasing the debt the venture owed to a Jackson-owned company, which increased the amount the [Stevenson entities] would have to pay at closing. Second, the arbitrator

---

[3] It is undisputed that RICSHA was not a signatory to either of the operating agreements.

[4] In making this determination, the arbitrator found that RICSHA was "wholly owned and controlled by" Jackson and that the Stevenson entities' "conspiracy claims against the [Jackson entities] and RICSHA [we]re based on the same general facts and circumstances, ar[o]se from the same essential transaction or occurrence, [we]re based on the same operative facts, and [we]re inherently intertwined with the other pending claims in this case."

4

found that, after the [Stevenson entities] had exercised the right to buy, the [Jackson entities] improperly removed from the venture's balance sheet certain assets, specifically parcels and options to purchase parcels of property, including one that was technically owned by now-respondent RICSHA but which had always been recognized as an asset of the venture.

The net result was an award to the [Stevenson entities]. The arbitrator awarded the [Stevenson entities] as compensatory damages $3,752,700 plus interest against the [Jackson entities] and RICSHA.

The [Stevenson entities] filed an application in [the trial] court to confirm the award. Now-respondent RICSHA filed an application to vacate the award and, 11 days later, a separate motion to vacate the award. The other [Jackson entities] answered the confirmation application. More than two months later, the other [Jackson entities] filed a "notice of joinder" in RICSHA's motion to vacate.

The [trial] court found that the [Jackson entities] other than RICSHA "did not file a timely and sufficient motion to vacate, so their purported opposition to confirmation [was] barred by the FAA's statute of limitation[ ]." The court found that the arbitrator did not exceed his powers by including RICSHA as a party to the arbitration, and so denied its motion to

vacate the award.[5] The court granted the application to confirm the award, and RICSHA and the other [Jackson entities] filed this appeal.

*Jackson*, 374 Ga. App. at 741–43.

The Court of Appeals affirmed the trial court's judgment confirming the arbitration award against RICSHA and the signatory Jackson entities. See *Jackson*, 374 Ga. App. at 748. The Court of Appeals first noted that "federal substantive law" applied under the FAA (instead of the Georgia Arbitration Code) and observed that judicial "review of an arbitration award in a confirmation proceeding is strictly limited."[6] Id. at 743 (citations and punctuation omitted). Given the extensive record of the completed arbitration and the arbitrator's factual findings, the Court of Appeals rejected RICSHA's "argument that we review de novo the arbitrator's decision to include RICSHA in the arbitration." Id. at 744.

The Court of Appeals then upheld the trial court's decision that the arbitrator had permissibly "applied principles of estoppel … although he did not use that word," in keeping with the "general rule [that] arbitrators are free to apply broad principles of justice and good conscience and decide according to their concept

---

[5] Specifically, the trial court found that "applicable law permitted the arbitrator to join RICSHA as a Respondent based on the equities in the unique circumstances of this case and the doctrine of equitable estoppel."

[6] On appeal, the parties do not dispute that the FAA applies here. Where the FAA applies, the decisions of federal courts interpreting the FAA are generally controlling with respect to many of the issues that arise out of arbitration proceedings. However, as discussed in more detail below, the question before us – whether a nonsignatory, such as RICSHA, is bound by an arbitration agreement that it never agreed to – is a question controlled by traditional principles of state law. See *Arthur Andersen LLP v. Carlisle*, 556 US 624, 631 (2009).

or notion of justice." Id. at 746. The court explained that the doctrine of equitable estoppel could apply when arbitration claimants "alleged interdependent claims and concerted misconduct between a signatory and the nonsignatories," and although most "cases involved nonsignatories seeking to compel signatories to arbitrate, the courts did not confine their holdings to those circumstances." Id. at 747 (citations omitted). Furthermore, the Court of Appeals explained that "[o]ther courts have applied these principles to compel arbitration against a nonsignatory to the contract containing the arbitration provision." Id. Because the trial court found that "the arbitrator had considered allegations and evidence of collusion between RICSHA and the other [Jackson entities] as well as the intertwined nature of the claims arising from RICSHA's concerted misconduct with the other [Jackson entities]," the Court of Appeals concluded that "[the other Jackson entities] and RICSHA ha[d] not shown that the arbitrator exceeded his powers, 9 USC § 10(a)(4),[7] or that the [trial] court's ruling confirming the award [wa]s erroneous." Id. at 746, 748 (citation omitted).

The Court of Appeals noted that there were several other issues that had been raised on appeal which it did not need to reach given its holding that the trial court did not err in confirming the award. One of those issues that was not decided by the Court of Appeals was the Jackson entities' contention that "the award is indivisible and ... because the award against RICSHA

---

[7] 9 USC § 10(a)(4) provides, in relevant part, that

the United States court in and for the district wherein the [arbitration] award was made may make an order vacating the award upon the application of any party to the arbitration where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

7

was erroneous, the entire award, not just the erroneous award against RICSHA, must be vacated." Id. at 748.

2. *Analysis*

(a) *The trial court applied the wrong standard of review in confirming the arbitration award against RICSHA.*

To start, we address the standard of review that a trial court should use when deciding whether a nonsignatory is bound by an arbitration agreement contained in a contract entered into by other entities. We conclude that the trial court applied the wrong standard here.

The United States Court of Appeals for the Fifth Circuit has explained that "[t]here are three types of disputes concerning arbitration: (1) the merits of the dispute; (2) whether the parties agreed to arbitrate the merits; and (3) who has the primary power to decide whether the parties agreed to arbitrate the merits." *ConocoPhillips v. Local 13-0555 Steelworkers Intl. Union*, 741 F3d 627, 630 (5th Cir. 2014) (emphasis omitted). And the United States Supreme Court has explained that the answer to the "who" question dictates the standard of review to be applied by a court reviewing an arbitrator's decision as to whether a party can be compelled to arbitrate. See *First Options of Chicago, Inc. v. Kaplan*, 514 US 938, 943 (1995). If the parties "agree[d] to submit the arbitrability question itself to arbitration," the court "should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." Id. But "[i]f, on the other hand, the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question … independently." Id. Moreover, a court "may make an order vacating the award upon the application of any party to the arbitration … where the arbitrators exceeded their powers." 9

8

USC § 10(a)(4).

In its order, the trial court noted that it would not "second-guess the arbitrator's findings and conclusions, particularly with respect to matters regarding his jurisdiction and the scope of the underlying arbitration." It further explained:

> Although a party may not ordinarily be compelled to arbitrate unless it agreed to do so, parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as *whether* the parties have agreed to arbitrate or whether their agreement covers a particular controversy.

(cleaned up).

Thus, it is apparent that the trial court, and the Court of Appeals in turn, answered the "who" question by deferring to the arbitrator, just as it would do if RICSHA had in fact agreed to arbitrate. However, because RICSHA did not sign the agreements containing the arbitration clause (as discussed in further detail below), it is apparent that RICSHA did not "agree to have an arbitrator decide" anything, including the question of arbitrability. Therefore, we conclude that the question of arbitrability in this case was a question the trial court should have decided independently and that it erred in deferring to the arbitrator. And the Court of Appeals erred in essentially adopting that same standard.[8]

---

[8] Our second certified question considered whether the arbitrator exceeded his powers by joining nonsignatory RICSHA to the arbitration. For the reasons discussed in this division, as well as those discussed below, we agree

9

Because RICSHA did not agree to submit the arbitrability question to arbitration, the courts must independently resolve that question. And, because the question of the arbitrability of the claims against RICSHA necessarily requires a determination of whether RICSHA is bound by the arbitration agreements in this case, we review the trial court's judgment on the question of arbitrability like we would any other trial court decision finding that an agreement binds an entity. We accept findings of fact that are not clearly erroneous but decide questions of law – such as whether an entity is subject to an arbitration agreement – de novo. See *ConocoPhillips*, 741 F3d at 630. Because the issue before us – whether a nonsignatory, such as RICSHA, is subject to an arbitration agreement that it never agreed to – is a question of law that we review de novo, and because we assume as true the factual allegations made by the Stevenson entities, our analysis is limited to the dispositive question of law and unaffected by any factual findings made by the arbitrator. As discussed below, even if we assume that the facts posited by the Stevenson entities are true, those assumed facts do not support binding RICSHA to the arbitration agreement.

(b) *Under the circumstances of this case, equitable estoppel was improperly applied to compel the nonsignatory entity (RICSHA) to arbitrate.*

The Jackson entities first argue that, under *Burke Moore Law Group, LLP v. Drew, Eckl & Farnham, LLP*, 374 Ga. App. 810 (2025),[9] "only those signatories to an arbitration agreement

---

that he did so. See *Klay v. United Healthgroup, Inc.*, 376 F3d 1092, 1112 n.20 (11th Cir. 2004) ("If a dispute is nonarbitrable, then an arbitrator necessarily exceeds his powers in adjudicating it.").

[9] The Court of Appeals's decision in *Burke Moore* (Mar. 12, 2025) was issued two days after its decision in this case.

10

may be compelled to arbitrate." Id. at 815 (citations and punctuation omitted). They contend, contrary to the decisions below in this case, that a signatory plaintiff cannot use equitable estoppel offensively to compel an unwilling nonsignatory to arbitrate the signatory's claims that the nonsignatory acted in concert with signatory defendants. Under the circumstances present in this case, we agree.

To start, we agree with the statement of law in *Burke Moore* that, in general, only signatory parties to an arbitration agreement may be compelled to arbitrate. 374 Ga. App. at 815. See *Lamps Plus, Inc. v. Varela*, 587 US 176, 184 (2019) (noting a "rule of fundamental importance under the FAA, namely, that arbitration is a matter of consent, not coercion" (cleaned up)); *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 US 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Because it is undisputed that RICSHA did not sign either of the operating agreements containing arbitration clauses, we begin our analysis with the foundational presumption that, as a general matter, nonsignatory parties like RICSHA should not be compelled to arbitrate and that any claims brought against it by the signatories should instead proceed in litigation.

As the Court of Appeals below correctly observed, there are exceptions to this general rule. See *Jackson*, 374 Ga. App. at 745. If applicable, these limited exceptions – based on "traditional principles of state law" – would "allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ago, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 US 624, 631 (2009) (cleaned up). See

11

also *Lawson v. Life of the South Ins. Co.*, 648 F3d 1166, 1170–71 (11th Cir. 2011). The Stevenson entities argue – as the arbitrator, the trial court, and the Court of Appeals concluded below – that the doctrine of equitable estoppel applies here to enforce the operating agreements, and namely the arbitration clause, against RICSHA despite its position as a nonsignatory.

Equitable estoppel has been used, under certain limited circumstances, to bring a nonsignatory party within the terms of an arbitration agreement. It has most typically been applied "where a non-signatory who had been sued under the contract containing the arbitration agreement sought to require the plaintiff, who was a signatory to that agreement, to abide by the same." *Burke Moore*, 374 Ga. App. at 815. See *Order Homes LLC v. Iverson*, 300 Ga. App. 332, 338–39 (2009) ("[N]onsignatories to an agreement may have a right to compel arbitration under the doctrine of equitable estoppel … when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory."). Equitable estoppel applies in that scenario where a nonsignatory seeks to compel a signatory to arbitrate because the signatory has received the "direct benefits" of the contract itself. See *Burke Moore*, 374 Ga. App. at 818 ("[T]he purpose of applying equitable estoppel to compel a plaintiff to arbitrate his claims is to prevent the plaintiff from relying on the contract when it works to his advantage (i.e., to establish his claim), and repudiating it when it works to his disadvantage (i.e., to avoid arbitration)."). See also *Order Homes*, 300 Ga. App. at 339 (applying equitable estoppel to prevent signatory plaintiffs from avoiding arbitration with the nonsignatories where signatory plaintiffs attempted to sue nonsignatories for claims arising out of the agreement while avoiding the arbitration clause pertaining to these same claims).

12

But applying equitable estoppel in the reverse – to hail a nonsignatory into arbitration at the signatory's request – is far less established and is not supported by the same notions of fairness and equity. See *Leevers v. Bilberry*, 2007 WL 315344, at \*4 (M.D. Ga. Jan. 31, 2007) ("The equitable estoppel exception simply does not apply in this context, and cannot be used to require a nonsignatory defendant to arbitrate a dispute where it never agreed to arbitrate anything."); *Burke Moore*, 374 Ga. App. at 817 ("Georgia courts have only allowed *a defendant* to rely on equitable estoppel to force arbitration of claims by a plaintiff where the plaintiff's claims arose out of a contract containing an arbitration clause." (emphasis in original)).

Other jurisdictions have recognized what they call a "direct benefits" theory of equitable estoppel to require nonsignatories to arbitrate in certain limited circumstances. But even if we were to adopt that theory and apply it here, it would not aid the Stevenson entities' position.

The jurisdictions that recognize this theory have held that a nonsignatory can be compelled to arbitrate where it has received benefits that "flow directly from the agreement, rather than indirectly from the contractual relation of the parties to the agreement." *Vitol, Inc. v. Copape Produtos de Petróleo LTDA*, 2024 WL 1216660, at \*1, \*8 (SDNY Mar. 21, 2024). "[T]o trigger the doctrine[,] the benefit received by the non-signatory must flow directly from the agreement." *Everett v. Paul Davis Restoration, Inc.*, 771 F3d 380, 384 (7th Cir. 2014). "[A] benefit derived from the agreement itself is direct," but "a benefit derived from the exploitation of the contractual relationship of parties to an agreement, but not the agreement itself[,] is indirect." Id. at 384–85.

In *Everett*, the Seventh Circuit held that a nonsignatory

13

could be forced into arbitration because she was "not merely exploiting the contractual relationship among [the signatory parties], but rather the benefit of the contract itself" when she was receiving the same benefits under the contract – i.e., owning a franchise and trading upon the name, goodwill, reputation, and other contractual benefits of the franchise agreement – as the signatory party. 771 F3d at 384. Similarly, in *Vitol, Inc.*, the Southern District of New York determined that a nonsignatory was "estopped from arguing that it [wa]s not bound by the Arbitration Clause" after it used the contract's provisions to invoke favorable pricing, amend the supply of products, and ultimately take possession of the products. 2024 WL 1216660, at *8.

The Stevenson entities contend that RICSHA directly benefited from the operating agreements when it "interfered with [the Stevenson entities]' rights under those agreements to retain assets that would have been transferred to [the Stevenson entities] in the buy-sell transaction" (the parcels and options to purchase parcels of property). However, even if this allegation is true, this would not trigger application of the direct benefits theory of estoppel, assuming that we were to adopt that theory, because such a claim is not a claim that RICSHA directly benefited from the operating agreements themselves but rather a claim that RICSHA sought to interfere with those agreements to benefit itself. RICSHA's alleged interference with these agreements may very well trigger liability against it, but that is not enough under the direct benefits theory of estoppel to subject it to an arbitration provision that it never agreed to be bound by and that is contained in an operating agreement that it never sought benefits under.

Because RICSHA's actions did not exploit, or even seek to invoke, the benefits governed by the contract itself, any benefit to RICSHA would be far too indirect to warrant the application of

direct benefits estoppel. See *Lawson*, 648 F3d at 1172 ("Under Georgia law, a plaintiff's claims must directly, not just indirectly, be based on the contract containing the arbitration clause in order for equitable estoppel to compel arbitration of those claims."). See also *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F3d 773, 779 (2d Cir. 1995) (holding that an "indirect benefit" not derived from the *agreement itself* containing the arbitration clause, is "not the sort of benefit which this [c]ourt envisioned as the basis for estopping a nonsignatory from avoiding arbitration"); *Vitol, Inc.*, 2024 WL 1216660, at *8 ("[T]o be bound under a theory of direct benefits estoppel, the nonsignatory beneficiary must actually invoke the contract to obtain its benefit, or the contract must expressly provide the beneficiary with a benefit." (citations and punctuation omitted)). Accordingly, the doctrine of equitable estoppel has no application here.

The Stevenson entities also contend that RICSHA took advantage of the operating agreements by requesting a contractual award of attorneys' fees during the proceedings. This argument that RICSHA sought the "benefit" of an attorneys' fees award under the agreement containing the arbitration clause does not show that direct benefits estoppel should apply in this case. In "Respondents' Second Amended Answering Statement and Counterclaims" – filed after RICSHA was added as a party to the arbitration, over its clear and persistent objection – the Jackson entities asserted a counterclaim for "an award of the costs of the arbitration and recovery of attorneys' fees and expenses under Section 16.17(d) of the Operating Agreements." But the Jackson entities expressly stated that "[t]hese counterclaims are asserted by those Respondents who are parties to the relevant Operating Agreements and the Consulting Agreement: Artisan Built Parent, LLC; SAWS Parent, LLC; Naturewalk Development Company Parent, Inc.; and JIG Real Estate, LLC." RICSHA, therefore, was

clearly not included in this request and made no attempt to use the arbitration agreements to obtain any benefit. In a later filing, "Respondents' Post-Hearing Brief," the Jackson entities again argued that they "should be awarded their attorneys' fees and expenses of litigation under the Operating Agreements' fee-shifting provision." But because the fees were being sought under the terms of the operating agreements, to which RICSHA was not a party, RICSHA could not have sought an award under the attorneys' fees provision of the operating agreements. Moreover, because RICSHA was forced to arbitrate over its objection, principles of fairness and equity dictate that its participation, if any, in the proceedings after it was joined should not be held against it. Thus, we cannot conclude that RICSHA sought to benefit under the terms of the operating agreements in this respect.

Finally, any argument that nonsignatory RICSHA should be compelled to arbitrate for another reason, i.e., by piercing the corporate veil or because the Stevenson entities' claims against RICSHA and the signatory Jackson entities are "inherently intertwined," is meritless. "A cardinal precept of corporate law is that corporations are separate legal entities from their shareholders, officers, directors, and employees … even in the situation in which a corporation is owned solely by one person." *Dep't of Transp. v. McMeans*, 294 Ga. 436, 437 (2014) (citations omitted). While this principle has exceptions where the corporate veil may be appropriately pierced, the arbitrator did not find, nor did the Stevenson entities argue, that there was any "legal reason to pierce the corporate veil" of RICSHA or any other Jackson entity in this case. See id. (citations omitted). Accordingly, we will not ignore the separate corporate form of RICSHA or any other Jackson entity merely because they are owned by Jackson. See id. at 437–38 ("[G]reat caution should be taken by courts in disregarding the

16

corporate entity." (citation omitted)). Moreover, there is no "inherently intertwined" theory of estoppel in Georgia, so the arbitrator's use of this language in its decision does not constitute a finding that any of the "traditional principles of state law" had been met. Without such a finding, the general rule governing arbitration – that a nonsignatory to an agreement should not be compelled to arbitrate – remains true.

For these reasons, we conclude that the Court of Appeals erred in affirming the trial court's judgment confirming the arbitration award against RICSHA. Because RICSHA did not sign the operating agreements containing the arbitration provision and did not assert any claims under those agreements or otherwise seek to use them to its benefit, it should not have been compelled to arbitrate claims brought against it by the Stevenson entities under a theory of equitable estoppel. It is evident that the arbitrator exceeded his powers by joining RICSHA to this arbitration and compelling it to arbitrate against its will and over its objection. We therefore reverse the judgment of the Court of Appeals affirming the trial court's judgment confirming the arbitration award against RICSHA and vacate the arbitration award against RICSHA. We remand the case to the Court of Appeals with direction that it consider the other issues that it previously declined to address as a result of it affirmance of the trial court's judgment, specifically including whether the arbitration award against the Jackson entities (the respondents other than RICSHA) may stand or must be set aside in light of our ruling. We express no opinion on the outcome of that question or any others not addressed by this opinion.

*Judgment reversed in part and vacated in part, and case remanded with direction. All the Justices concur, except Warren, P.J., not participating.*

17